No. 31,198.

The City of Kansas City, *Appellee*, v. L. M. Burns and Employers' Liability Assurance Corporation, Limited, of London, England, *Appellants*.

(22 P. 2d 444.)

Opinion filed June 10, 1933.

*Arthur J. Mellott, Hugh E. Brownfield,* both of Kansas City, and *John J. Cosgrove,* of Kansas City, Mo., for the appellants.

*Alton H. Skinner,* city attorney, *C. W. Trickett* and *William Drennan,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

HUTCHISON, J.: This is an action by the city of Kansas City, against L. M. Burns, cashier of the water and light department of the city, and the surety on his bond to recover $5,689.31, an alleged shortage existing on April 20, 1929, in the funds collected by him for the city.

The allegations of the amended petition are in the usual form, setting up a copy of the bond and its approval on May 10, 1927, insuring the cashier to April 28, 1929, and that Burns, as cashier, withheld from the city the funds of the city to the sum of $5,689.31, although demand had been made therefor.

The answer of the surety company admits the corporate existence of plaintiff and itself and the execution of the bond, but denies generally all the other allegations of the amended petition, and specifically denies any failure on the part of Burns to faithfully perform the duties of his office and safely keep all public money and render a true account thereof and save the city from loss by neglect of duty or malfeasance in office. The surety company further denies that there was any default, and alleges that Burns was not an officer, that the bond was not an officer's bond, but only a fidelity bond, that the city officers neglected to audit and keep accounts and an audit is now impossible, that an audit is the only way to determine the existence of a shortage, that any apparent shortage is due to "unadjusted credits," duplicate payments, "float" and the crediting of delinquents; that if any discrepancies exist, they occurred long prior to the giving of the bond; and that the officers of the city acted in bad faith, knowing of such discrepancies and former shortages, failing to inform the surety company before it gave this bond, and permitting Burns to act some time without any bond.

The reply was a general denial. A referee was appointed by the trial court, who heard the evidence, made findings and conclusions, which were later approved by the trial court, and judgment was rendered for plaintiff and against defendants for the full amount claimed in the amended petition, with interest and costs and for a fee of $750 for the referee. The defendants appeal, assigning numerous errors.

We will first consider the error assigned in overruling the demurrer to plaintiff's evidence, which the record shows was waived, if it was an error, by the defendants proceeding to introduce evidence in defense and in support of the allegations of their answer, as held under many decisions, one of the latest being *Stoutenberg v. Gaston,* 131 Kan. 610, 293 Pac. 385.

"When a demurrer to the evidence is improperly overruled and the defendant, instead of standing on his demurrer, introduces evidence which supplies the deficiencies in the plaintiff's evidence, it is held that error in overruling defendant's demurrer to the evidence is immaterial." (Syl. ¶ 3. See, also, *Railway Co. v. Bentley,* 78 Kan. 221, 93 Pac. 150; and *Hospital Co. v. Odd Fellows,* 99 Kan. 488, 162 Pac. 302.)

There is no question as to the evidence of the defendants, particularly that of defendant Burns, tending to supply the deficiencies claimed by the defendants to have existed in the evidence of plaintiff, particularly as to a shortage existing in the cashier's funds during the period covered by the bond. Reference in particular is had to the following testimony of defendant Burns:

"There has not been much difference in the shortage since the installation of the Price-Waterhouse system. I think it was installed in the middle of 1927. The shortage on January 1, 1929, was $5,500. I do not have any memorandum to show what it was on January 1, 1928, but it was somewhere around $5,500. I cannot tell you exactly in dollars and cents what it was in July, 1927, or May, 1927. I happen to know it was $3,700 in 1926, and $1,400 was added to it in the last three months of 1926 and the first three months of 1927."

"Q. Is it not a fact, Mr. Burns, that on the night of the 17th of April, at about eight o'clock, that Mr. Sinderson came into your office when you was making up your statement and he then and there, by just checking your own figures, checked out a shortage of $5,689.27—isn't that correct? A. Substantially, yes.

"Q. Let's put it a little different, in order to be fair. In order to make your payment and your turnover of the 18th you had to use money that was in payment of stubs that were being withheld in order to make that turnover, didn't you? A. I took the money, checks and subsequent mail collections to settle that account."

Many errors are assigned with reference to the introduction of evidence before the referee. This, too, is not generally a ground for reversal in a trial not before a jury, even presuming the incompetent evidence was considered by the referee, unless the record discloses that there was no competent evidence to support the findings or that incompetent evidence is affirmatively shown to have affected the result.

"A judgment rendered in a case heard without the intervention of a jury will not be reversed on account of the admission of incompetent evidence, unless the record discloses that there was no competent evidence to support it or in some other way shows affirmatively that the improper evidence affected the result." (*McCready v. Crane,* 74 Kan. 710, syl. ¶ 1, 88 Pac. 748.)

This rule applies as well to the erroneous rejection of competent evidence except where a verified showing is made, as in this case with reference to one matter, which will be considered later. In an opinion written by the late Justice Mason in the case of *Daniels v. Hummel,* 108 Kan. 422, 195 Pac. 604, it was said:

"Complaint is made of rulings admitting and rejecting evidence. The trial was had without a jury, and the admission of incompetent evidence would not justify a reversal so long as there was sufficient competent evidence to support the decision, which we find to be the case, as indicated by what has already been said. Nor can a reversal be had for the exclusion of evidence, for no verified showing was made of its effect." p. 425. (See, also, *Collins v. Hayden,* 104 Kan. 351, 179 Pac. 308.)

This is almost exclusively a fact case. The burden was upon the city to establish by a preponderance of the evidence that a shortage existed in the funds belonging to the city and handled by the cashier during the time covered by the fidelity bond, and if a shortage did exist the burden was upon the defendants to establish any one of the several special defenses alleged in their answer, to avoid liability therefor.

The referee made fourteen findings of fact, and the trial court approved each and all of them. The following findings, or portions thereof, will give a general understanding of the facts and matters involved:

"I. Defendant L. M. Burns was appointed cashier in the office of the water and light department of the plaintiff city in the year 1917, and continued in said office until April 20, 1929, when he was suspended and discharged. On or about April 28, 1927, the defendant, the Employer's Liability Assurance Corporation, Limited, of London, England, duly made and executed to plaintiff their guaranty bond, which was duly approved by the board of commissioners of Kansas City, Kan., on May 10, 1927. . . .

"IV. That on the evening of April 17, 1929, at about 8 o'clock p. m., the certified accountants, Sinderson & Young, made an examination of the accounts in the cashier's office, Mr. Burns being present, and upon Mr. Burns' own tabulations found a seeming shortage of $5,689.27. The certified accountants almost immediately reported said fact to the board of public utilities, which board held an informal meeting on the night of April 19, and called a special meeting for the morning of April 20, 1929, and on said April 20,

1929, at about 9:30 a. m., suspended Mr. Burns and directed the accountants to immediately make a complete audit of the cashier's office.

"V. Immediately thereafter and on the morning of April 20, 1929, the certified accountants took charge of the office of cashier, closed and checked each of the teller's windows and found them in balance, and thereupon took all of the records, receipts, stubs, cash, checks and cash items to a separate room so that no subsequent receipts or transactions in the cashier's office would be mingled in any manner with the audit. Said detailed audit showed the cashier to be short in his accounts in the sum of $5,689.31, being a difference of only 4 cents from the examination made on the night of the 17th.

"VI. The business conducted in the cashier's office was as follows: There were three windows and three tellers—one for each window. Customers or consumers of water or light would present their notification card at the teller's window, and upon payment of same the teller would stamp paid the card and the coupon, or stub, attached, and would cut off the coupon, or stub, to be used for crediting the account of the customer. It was the practice and custom to make the breaks in the day's work at about 10 o'clock a. m. At this hour the date of the stamp was changed and all subsequent payments would be dated as of the day following, and the teller would make up a statement of the preceding day's work showing the accounts to be credited and the cash received and turn the same over to the cashier. Collections made by mail or paid through the bank went direct to the cashier. Upon receiving the report from each of the three tellers, the cashier would check the same and count the cash received from each teller so as to verify the teller's account. He would then make a recap of the collections made by the tellers and would add thereto the collections made by him through the mail and through the banks and would make a report to the accounting department of all collections made and the accounts to be credited, and also would deposit with the city treasurer the cash and checks and take the city treasurer's receipt, the total of which had to balance the total of the accounts to be credited. When these accounts and receipts reached the accounting department, they would be checked again to verify all figures, and, if in balance, would credit the accounts of customers and charge to the city treasurer the corresponding amount. There were no permanent records kept in the cashier's office.

"VII. These turnovers, or balance of accounts, were supposed to be of daily occurrence. However, the cashier got behind in making his reports, so that each turnover to the accounting department represented the transactions occurring from two or three days prior to the actual date when the report was filed. The matter of being two or three or more days behind time had been ·the practice for several years, and the reason therefor, as testified to by the defendant, Burns, was that it was customary for his office to carry assigned pay rolls, or assignments of pay checks, and to advance money temporarily for other purposes; that he was furnished the sum of $600 as an additional sum of money to be used for said purpose, but that said $600 at times would not be sufficient, and that he would have to withhold crediting customers until subsequent payments provided him with money sufficient to make his turnover. However, he testified, and there is no evidence to the contrary, that every

pay-roll assignment or due bill was paid in full and that there was no loss on account of that practice.

"VIII. When the report of the certified accountants was turned in to the board of public utilities the said board appropriated from other funds the sum of $5,689.31 and credited the accounts of the customers who had paid (as there were no funds on hand in the cashier's office to balance the same) and the necessity of so doing caused a loss to the city as of said date and time. The bond of the defendant, the Employer's Liability Assurance Corporation, Limited, of London, England, was the bond in force at said time, guaranteeing to hold the plaintiff free and harmless from all loss caused by neglect of duty or malfeasance in office of the defendant Burns.

"IX. . . . The defendant Burns was behind two or three days in making his turnover. On the 19th the reason given by him for being late in making turnovers was that at times he had to cash pay rolls, or assignments of pay rolls, which he would have to carry until he could get warrants for same. This, however, created no shortage in his accounts, for the reason that such assignments and due bills were counted as that much cash and, therefore, his office should be in balance every day of the year and every hour of the day and every minute of the hour.

"X. Your referee further finds that the actual shortage in the cashier's office commenced in the summer or fall of 1927. In the early summer of 1927 the defendant Burns sold his homestead at 449 North Fifth street, realizing therefor about $1,800. Out of this money he paid $400 on an automobile and was to pay an additional sum of $402 in installments. He then bought property in Comb's Park and commenced the erection of a new dwelling house thereon. This new dwelling house was completed a few days before Christmas, 1927. The first evidence of a shortage in defendant Burns' office was in the month of December, 1927. The defendant Burns was at home sick. Mrs. G. L. Pert, the assistant cashier, in attempting to make the turnover in his absence found that there was not sufficient cash to make the turnover by about $3,000. Thereupon she telephoned to defendant Burns, and, notwithstanding he was sick, he came to the office and turned over customers' checks sufficient in amount to cover said shortage. Defendant Burns testified that he obtained said $3,000 by opening the mail and taking checks and remittances therefrom sufficient in amount to make up the said sum of $3,000.

"XI. Your referee finds that between the dates of May 10, 1927, and April 20, 1929, the defendant L. M. Burns unlawfully abstracted and withheld funds belonging to the water and light department of which he was cashier and appropriated to his own personal use the sum of $5,689.31, and that demand was made upon the said defendant Burns for the payment of said sum and that said defendant Burns has failed, neglected and refused to pay the same and has withheld from the water and light department the said sum of money and unlawfully appropriated the same to his own personal use.

"XII. Your referee further finds that the bond of the defendant, the Employer's Liability Assurance Corporation, Limited, of London, England, was in force from about April 28, 1927, until April 28, 1929, and that said loss and misappropriation and withholding of said funds by the defendant Burns oc-

curred during the period covered by said bond, and that said defendant, the Employer's Liability Assurance Company, Limited, of London, England, is liable to the plaintiff herein for the said sum of $5,689.31, together with interest at the rate of 6 per cent thereon per annum from May 1, 1929.

"XIII. And your referee further finds that on or about April 22, 1929, the plaintiff, by and through its water and light department, drew a warrant upon its surplus fund for the said sum of $5,689.31 and used the same to make good the shortage of defendant, L. M. Burns, and to give credit to the customers who had paid their accounts, and for which there were no funds in the cashier's office. And the loss of the city occurred at said time, and the defendant, the Employer's Liability Assurance Company, of London, England, is liable therefor.

"XIV. . . . Your referee further finds that there is no credible or believable evidence in this case of any shortage in Mr. Burns' account prior to about December, 1927, when Mrs. Pert discovered a shortage of about $3,000. . . ."

Appellants strongly urge the insufficiency of the evidence to support the findings, relying upon the application of the ruling in the case of *City of Oswego v. Condon*, 124 Kan. 823, 262 Pac. 542, where this court held in an action by the city of Oswego against the city treasurer and the surety on his bond, that it was necessary for the plaintiff to show three specific facts:

"(1) The amount of money the officer had on hand at the beginning of the accounting period, (2) the amount of money that came into the officer's hands during the period covered by the accounting, and (3) the amounts of disbursements lawfully made by the officer during the accounting period. From these three facts or factors, the amount for which the officer is responsible can be computed, and the shortage, if any, determined. However much work the ascertainment of these factors may entail, without them any accounting is worthless." (p. 824.)

Appellants insist that the same rules as there announced as applicable to a city treasurer should apply to the cashier of the water and light department in this case, who kept no books or accounts, as the evidence and findings here show, whose duty was simply to make the collections and turn the funds over to the city treasurer daily. His duties are similar to those of a messenger—to receive and convey the funds.

Aside from the amount of money furnished by the city and regularly retained by the cashier for the purpose of making change at the three windows, he had no funds with which to begin. The payments and settlements were daily, but for convenience of the office, as found by the referee, they regularly ran a day late, and sometimes two or three days late. The office was not a disbursing one,

as that of a city treasurer, and he made no disbursements except for certain special emergencies to avoid the necessity of keeping parties waiting for certain items due them until the semimonthly meeting of the commission.

The three specific facts required in the Oswego city case are said, in the opinion above quoted, to be factors without which an accounting is worthless. An accounting, as defined in Webster's dictionary, is an "act or system of making up or stating accounts; a statement of account, or the debits and credits in financial transactions." Besides, in laying down the rule in the Oswego city case, the court prefaced the statement as being a general rule in determining shortages in officer's accounts. We hardly think this rule is applicable to one who keeps no books, makes daily settlements and is not expected to retain any funds in his hands except the money used for change for the next day's work, and some stubs necessarily held over until the next semimonthly meeting of the commission, when the float is cashed and every stub can be turned in.

Appellants cite *Bernhard v. City of Wyandotte*, 33 Kan. 465, 6 Pac. 617, which is an action upon a city treasurer's bond to show that all transactions, if necessary, may be introduced in evidence to prove that the city treasurer did not account for certain particular items, and argue therefrom that every transaction during the two years covered by the bond should be shown before any shortage can be ascertained or determined.

Appellants charge that the referee must have relied upon a doctrine once asserted and since reversed, that the loss and shortage in an account can be regarded as occurring when the examination of the books show the same to exist, instead of the time the money was withdrawn from the business. Again this is a bookkeeping comparison not applicable here to a system intending daily handling and settlements. The referee finds the shortage existed April 17, 1929, when the accountant and the cashier found the receipts would not balance the stubs by $5,689.27, and on April 20, 1929, when the cashier was suspended, the same shortage, plus four cents, existed. Two of the provisions of the bond were to save the city free and harmless from all loss caused by neglect of duty or malfeasance in office, and to pay over any money which shall come into his hands as such cashier. The shortage was simply the amount of money which the cashier on April 20, 1929, failed and neglected to pay to the city, that had come into his hands as cashier. The evidence,

however, does not stop there, but goes back to December, 1927, after the bond was given in April, 1927, and approved on May 10, 1927, and shows a positive shortage of $3,000 about the same time a showing was made of heavy purchases and expenditures beyond salary and income of the cashier, which furnishes a strong circumstance toward the reasonable inference and conclusion that the $3,000 shortage existing at that time was a loss to the city by the neglect and malfeasance of the cashier. We know of no rule requiring a definite determination of the day the loss occurred by the withholding of the funds by the cashier, other than that it be within the time covered by the surety bond. A careful examination of all the evidence introduced, even without the admissions of the defendant Burns as above quoted, shows there was sufficient, if believed, to support the findings of the referee.

Appellants argue forcibly that sureties are only liable for defaults of their principals during the term for which the bond is given and in the same connection point out evidence that they say was undisputed, to the effect that a shortage existed prior to the execution of the bond. The argument on the first point is readily conceded, but as to undisputed evidence showing prior shortage it may not have been definitely disputed but it may not have been given credence by the referee.

"The trier of the facts is not bound to believe evidence the truth of which is not admitted, merely because no direct testimony to the contrary is introduced." (*Swartz v. Levin,* 108 Kan. 224, syl. ¶ 2, 194 Pac. 646.)

Many authorities are cited as to Burns not being an officer and his bond not being an official bond, but nothing to show that he and the surety are not liable on the bond as given to protect the city against his neglect of duty or malfeasance as cashier of the water and light department of the city. A janitor around the city offices, where money is accessible, can be bound by a fidelity bond, although he is not an officer of the city.

A further and separate topic briefed by the appellants is that no neglect of duty or malfeasance has been shown, and numerous authorities are cited where the evidence failed to show such neglect or malfeasance, but, according to the findings here, there was no failure in that respect and the shortage admitted by the cashier shows neglect and malfeasance in withholding the funds unless he or his codefendant have shown that to have been overcome by their proof of some one of their defenses.

Much is said in appellants' brief about what is termed and described as the "float," and it being the cause of all the apparent discrepancies. The seventh finding, above quoted, describes it and concludes that no loss whatever occurred to the city or any one on account of it.

It is further urged that the surety should not be liable on the bond for the mistakes of the assistant cashiers. The abstract shows considerable evidence concerning mistakes made by them at the windows, but there is no finding that any of such losses were included in the shortage found against the cashier, and, therefore, neither the cashier nor the surety are made liable for such mistakes.

Appellants submitted to the referee sixty findings of fact and twenty-five conclusions of law, and they assign error that their findings and conclusions were not adopted. The failure of the referee to adopt and use thirty-one of these requested findings is especially assigned as error, and a careful examination of them indicates that ten of them are substantially covered in the findings made by the referee. Fourteen others give details of matters covered generally. Six concern the "float," of which it is found by the referee, supported by the evidence of the cashier, that not one dollar was ever lost by the handling of the "float," and one of these findings concerns the pleadings. We find no error in the referee declining to go to this very unusual extent, mostly in details, as requested. The failure to adopt the twenty-five conclusions of law is a matter that could be readily corrected by the trial court, or even yet by this court, on review, if convinced that such was or is the law applicable to the findings of fact as made and approved. Evidently the trial court did not regard them as being proper conclusions, and we think there was no error in so holding.

Appellants filed an affidavit which was used on the hearing of the motion for a new trial, and it sets up evidence of the witness Barnard, which was excluded by the referee, to the effect that if he had been permitted to answer the question asked he would have stated, "that the only method for determining whether or not an actual shortage existed in Mr. Burns' or the cashier's department, would be to go back and make a detailed audit." The resort to an audit, even if it were possible, becomes unnecessary after the principal in the bond has admitted the existence of the shortage within the period covered by the bond.

Many other points are raised and assigned as error, among them

the overruling by the trial court of appellants' motion for review and modification of the findings and conclusions of the referee and the sustaining of plaintiff's motion to approve and confirm the same, and no error is apparent.

Appellants suggest the fee of the referee is too large, but the length of time required to hear and determine the issues raised and the very unusual amount of testimony offered and considered make the amount not unreasonable.

We have carefully considered each and every point raised and urged by counsel for appellants in the very exhaustive and well-prepared brief, which has apparently omitted nothing and has supported each and every assertion and contention with numerous authorities, but we find no substantial or reversible error to have been committed by the referee or the trial court, and we therefore conclude that the judgment of the trial court should be affirmed. It is so ordered.