No. 43,894

HAROLD H. STUMP, *Appellee*, v. (RALPH M. POMEROY, et al.), MARY ALICE DRENNAN FLINT and HELEN DRENNAN BECKETT, *Appellants*, and JOHN D. FINLEY, *Appellee*.

(402 P. 2d 794)

Opin-
ion filed June 12, 1965.

*David W. Carson,* of Kansas City, argued the cause, and *John K. Dear, Ernest N. Yarnevich, J. W. Mahoney, Joseph T. Carey,* and *John H. Fields,* all of Kansas City, and *Robert F. Galloway* and *Edward F. Wiegers,* of Marysville, were with him on the brief for the appellants.

*Rowland Edwards,* of Waterville, argued the cause, and was on the brief for the appellee, John D. Finley.

*William M. Drumm,* of Seneca, argued the cause, and *Harry A. Lanning,* of Seneca, was on the brief for the appellee, Harold H. Stump.

The opinion of the court was delivered by

FONTRON, J.: This is an action to quiet the title to a section of land in Marshall county, known as the Drennan Ranch. The trial court adjudged the plaintiff, Harold H. Stump, and one of the defendants, John D. Finley, each to be the owner of an undivided one-half (½) interest in the ranch, and quieted their titles accordingly. Stump and Finley, both, are appellees in this court and will be referred to, individually, by their surnames.

Two of the defendants, Mary Alice Drennan Flint and Helen Drennan Beckett, filed an answer to the plaintiff's petition and contested the titles of both appellees in the court below. They alone have appealed from the trial court's judgment and will be designated as appellants throughout this opinion.

Since Stump and Finley derive their titles by means of different conveyances, the validity of each title must be discussed and considered separately. We shall first direct our attention to the title asserted by Finley.

The Drennan Ranch was acquired in 1872 by John Drennan, a man of apparent foresight, industry and diligence, who fathered a family of ten children. Eventually, title to the ranch became vested in two of his brood; Alice, a maiden lady of some apparent business ability and acumen, and Edward, the youngest son, also single, who seemingly was overly protected by other members of the family. The appellee, John D. Finley, and the appellants, Mary Alice Drennan Flint and Helen Drennan Beckett, are third generation Drennans, being nephew and nieces respectively of Edward and Alice.

Alice Drennan died in 1954, leaving a will which is of controlling importance to Finley's claim. The provisions of this document, which are pertinent to the present appeal, read as follows:

"*First*: I give, devise and bequeath unto my brother Edward Drennan all my real estate and personal property of which I may be the owner at the time of my death, to be by him taken and held for his own use and disposal as he may deem right and proper, charging him only with my debts and expenses.

"*Second*: It is my will that upon the decease of my said brother or upon my decease if I shall survive him, and the one-half interest which I own in Section Twenty-three (23), Township Four (4), Range Seven (7) in Marshall County, Kansas, has not been disposed of by him or me, then and in that event and subject to the rights secured to my brother hereby, I do give and devise the same in equal shares share and share alike to my nieces Mary Alice Drennan Flint and Helen Drennan Beckett."

Alice's will was duly probated and her estate administered. On June 6, 1955, a final decree was entered assigning Alice's half interest in the ranch to Edward Drennan "subject to all of the conditions and provisions of said will."

On October 24, 1955, after some preliminary conversations, Edward Drennan contracted to sell to John D. Finley, and his wife Eunice, the one-half interest in the ranch acquired from Alice's estate. The contract recited a consideration of Twenty Thousand Eight Hundred Dollars ($20,800.00), payable as follows: $2,800.00 on signing the agreement, and the remaining $18,000.00, which was to be secured by note and mortgage, to be paid over a twenty (20) year period, together with two percent (2%) interest on unpaid balances.

The appellants attack the validity of this sale on two grounds: First, that it was induced by fraud, undue influence, duress, or cheating on Finley's part, and second, that it exceeded the limited power of disposal possessed by Edward under Alice's will.

We may dispose of the first contention summarily. The trial court specifically found there was "no clear, satisfactory and convincing evidence of fraud or undue influence or duress or cheating in connection with the conveyance from Edward Drennan to John Finley." On oral argument, appellants' counsel conceded there was evidence to support these findings, and further consideration of the first contention is thereby precluded.

Supporting their second ground, the appellants urge that, under Alice's will, Edward took only a life estate with qualified power of disposal, and they cite *Pearson v. Orcutt*, 106 Kan. 610, 189 Pac. 160, and *Parsons v. Smith, Trustee*, 190 Kan. 569, 376 P. 2d 899. We are inclined to agree with the appellants on this point and, indeed, Finley's counsel, on oral argument, conceded that Edward

was not empowered to dispose of Alice's half interest in the ranch by gift.

The real controversy between Finley and his cousins, the appellants, is whether Edward's conveyance exceeded his qualified power of disposal. The appellants argue that Edward's power of disposition was limited under Alice's will to his support and maintenance. If, by this, it is meant that Edward could convey the property only if he were destitute and without the necessities of life, we think the construction far too narrow.

The language of Alice's will suggests no intention that Edward's power be so circumscribed. Her words, in leaving Edward her property, are "to be by him taken and held *for his own use and disposal as he may deem right and proper,* charging him only with my debts and expenses." (Emphasis supplied.) We believe Alice intended that Edward should be able to make any *bona fide* sale of the property left to him which would serve a purpose useful or beneficial to his interests.

The observations of this court in *Pearson v. Orcutt,* supra, are persuasive. In that case, the testator's will was construed and held to give the widow a life estate in his property with power of disposal. In construing the language, ". . . with full power to sell and dispose of the same in any way that she may desire" (p. 614), the court had this to say:

". . . His primary purpose was clearly to make provision for her maintenance, in the broadest sense of that term—for the use and disposition of the property for her interest and according to her judgment. She was at liberty to use it or its proceeds to meet the expenses of such manner of living as she might see fit to adopt, but this would not imply that she might give it away. (*Blair v. Blair,* 82 Kan. 464, 108 Pac. 827; *Griffin v. Kitchen,* 225 Mass. 311; *Bevans v. Murray,* 251 Ill. 603.) Doubtless she might have sold it in order to make an investment or embark in some other business than farming— matters said in the Kansas case just cited to be beyond the scope of mere maintenance. . . ." (p. 615.)

We conclude that Edward's power of disposal was not restricted to providing for himself the bare essentials of existence. It is our opinion that whatever sale Edward might in good faith conclude, the proceeds of which inured to his own benefit, would come within the ambit of his authority.

But the appellants contend that the transaction between Edward and Finley was not a *bona fide* sale, but a pretended or colorable sale only—that it was a mere sham. It is argued that Edward's conveyance to Finley constituted only a gift of Alice's half of the

ranch. Specifically, it is urged that no consideration passed from Finley to Edward or that, at best, the consideration was inadequate. These contentions require further examination, not only of the sale documents, including the note and mortgage signed by Finley and his wife, but of other matters, as well.

As we approach the question, we recognize the duty which rests upon a life tenant, with power of disposal, to act honorably and in good conscience in exercising that power. In *Windscheffel v. Wright,* 187 Kan. 678, 360 P. 2d 178, 89 A. L. R. 2d 636, we held:

"A life tenant with power to sell real property devised to her for life with remainder to designated persons, is a trustee or *quasi* trustee and occupies a fiduciary relation to the remaindermen, and in the exercise of that power, she owes to them the highest duty to act honestly and in good faith by selling the property to a *bona fide* purchaser for the best price offered." (Syl. ¶ 3.)

The recited consideration of Twenty Thousand Eight Hundred Dollars ($20,800.00), appearing in both the contract and the warranty deed executed thereunder, may not, in our judgment, be regarded as inconsequential. Although the amount is a thousand dollars less than the appraised value shown in Alice's estate, it is nonetheless a sizable and substantial sum, and to Edward, for reasons indicated by the record, it seemed reasonable.

Considerable emphasis is placed on circumstances surrounding the $2,800.00 down payment which Finley made by means of his check for $1,400.00 and a promissory note in like amount signed by himself and wife. The check was deposited in Edward's bank account on October 31, 1955. The note, which had been delivered to Edward, was later returned to Finley bearing the following endorsement: "This note has been satisfied Edward Drennan Dec. 1, '55."

On December 8, 1955, two checks made payable to Finley for $1,000.00 and $300.00, respectively, are shown to have been charged to Edward's bank account, and appellants would have us infer that they were given in repayment of Finley's $1,400.00 check.

The appellants designate the entire transaction, in which they would include Edward's two checks to Finley and the cancelled note, as a dishonest trick, but we doubt that it may thus be stigmatized. In two of his letters, penned after disagreement with Finley over a tenant, Edward indicates that Finley never did deliver the promissory note and the $1,400.00 check to him. The record itself, however, refutes such a claim. Edward and his nephew were on friendly terms until at least 1960. Finley's testimony that

he received the cancelled note and the two checks as gifts from Edward to help build a new home is quite believable. We are unable to infer, from anything in this record, any malign or pre-conceived plot on Finley's part to avoid the down payment.

In conclusion, the appellants say that, under his agreement with Edward, Finley was enabled to pay for his half interest in the Drennan Ranch with Edward's own money and, hence, that there was no consideration. This interpretation is drawn from the following provision in the sale agreement:

"The parties further agree that the $18,000.00 mortgage given by the second parties to the first party for the remainder of the purchase price shall be paid as follows:

"The entire rentals for each farm year will be collected and an account will be made between the parties by March 1 in each year. From the crop income, pasture rentals and other income of every nature from said real estate, the taxes will be paid and any insurance premiums will be paid. Any balance then remaining will be divided one-half (½) to Edward Drennan and one-half (½) to John D. Finley. The one-half (½) belonging to John D. Finley shall be retained by Edward Drennan and applied first to the payment of interest on all unpaid balances at the rate of two per cent (2%) per annum and any balance then remaining shall be applied on the principal debt. The first party gives to the second parties the privilege of paying additional sums on the unpaid balance at any interest payment date, which interest payment date shall be deemed to be March 1 in each year."

This provision must be read in conjunction with the promissory note signed by the Finleys which reads as follows:

"Twenty (20) years after date we promise to pay to the order of EDWARD DRENNAN Eighteen Thousand Dollars ($18,000.00) with interest at the rate of two per cent (2%) per annum until paid. Interest payable at Blue Rapids, Kansas. Interest payable semi-annually on the 24th day of October and April each year. Value received. The makers are given the privilege of paying on the principal of this note at any interest payment date in multiples of $100.00 and do now obligate themselves to make the following payments on the principal of this debt: The sum of $500.00 to be paid on the principal on the 24th day of October, 1956, and a like amount on the 24th day of October each year thereafter, with the remaining balance due and payable in full on October 24th, 1975.

"This note secured by a first real estate purchase money mortgage covering an undivided one-half (½) interest in Section twenty-three (23), Township four (4) south, Range seven (7) east, Marshall County, Kansas.

"Dated and signed this 24th day of October, 1955."

Construed together, we think the note and contract provide a sensible plan of payment so far as Edward is concerned. The note obligates Finley and wife to pay $500.00 per year, plus interest, on

the $18,000.00 indebtedness. These payments of principal and interest are due whether or not Finley's share of the farm income is sufficient to make them. Edward is thus assured of a fixed minimum income each year. In addition, any excess of farm income over taxes, insurance, interest and annual payment must be applied to principal giving Edward even more for his needs in good years. This type of contract, in which income from property sold is applied to payment of interest and principal, is not uncommon and, we believe, may often serve a useful purpose. It does not appear to lack monetary consideration.

Edward has, in fact, received interest from Finley amounting to $1,946.80, and Finley's note, since 1955, has been reduced to $11,897.03. This balance is still due on the note and it has been judicially determined to be an asset of Edward's estate, passing under Edward's will to these appellants.

It is significant that these appellants successfully resisted an effort by Finley to establish an oral agreement with Edward which would have resulted in cancelling the note upon Edward's death. By their insistence that Finley was bound on his note, the appellants may be said to have adopted an inconsistent position, but we are not disposed to predicate our decision on that basis. It is enough to say that Finley still owes substantially more than half the original purchase price of his half interest in the ranch.

We believe, moreover, that Edward received more than financial benefits from his agreement, for Finley assumed at least a portion of the burdens of management, including preparation of leases, accountings with the tenant, distribution of receipts, and handling other management details, both by phone and in person while visiting the ranch. It is safe to assume that Finley's assistance in such matters was a source of relief and accommodation to a man of Edward's background and age.

We find it unnecessary to discuss other matters in the record which tend to support our conclusion that a *bona fide* sale was consummated. Nor need we comment extensively on the several letters in which Edward charged Finley with unfair dealing. Written after disagreements with Finley, they reflect no more than a change of heart on the part of a somewhat querulous old gentleman. Moreover, they are immaterial in view of the trial court's findings negating fraud or unfair dealing.

The appellants raise a point of evidence. Over objection, Finley

testified as to conversations between Edward and Edward's counsel held on two occasions when Finley and Edward were at the attorney's office in connection with the pending sale. Whether or not this testimony violated G. S. 1949, 60-2804, we believe its admission was not prejudicial. First, much of the conversation pertained to Finley's claim against Edward's estate, which the trial court denied, and second, the gist of the remaining conversations was established by other evidence, especially the sale documents. Under such circumstances, the admission of the challenged evidence, even if erroneous, would not constitute reversible error. (*McCready v. Crane*, 74 Kan. 710, 88 Pac. 748; *Daniels v. Hummel*, 108 Kan. 422, 195 Pac. 604; *Kansas City v. Burns*, 137 Kan. 905, 22 P. 2d 444.)

We hold that Edward's conveyance to John D. Finley of the one-half interest in the Drennan Ranch, which he had inherited from Alice, was not in violation of his power of disposal under Alice's will, but that it was a valid sale and vested title in the grantee.

We now proceed to the second phase of this lawsuit and consider the title asserted by Stump. Edward Drennan died December 30, 1961, leaving a will in which he directed his executor, Walter Youngquist, to sell the residue of his property, real and personal (except items specifically bequeathed), for the best price obtainable, and authorized said executor to execute and deliver the necessary title documents.

On June 25, 1962, Stump contracted with Youngquist, the executor, to buy Edward's half interest in the Drennan Ranch for $30,-000.00 and, pursuant to that agreement, he received an executor's deed dated July 16, 1962. This sale is attacked on the ground that Youngquist acted in bad faith in making the sale, and that Stump is chargeable with notice of Youngquist's breach of fiduciary duty.

The appellants are correct in asserting that an executor acts in a fiduciary capacity and is held to the utmost good faith in his transactions regarding the estate. (21 Am. Jur., Executors and Administrators, § 251, p. 515; *Woodbury v. Schofield*, 131 Kan. 432, 292 Pac. 802; *Nelson v. Gossage*, 152 Kan. 805, 107 P. 2d 682; *In re Estate of Timken*, 177 Kan. 545, 280 P. 2d 561.) The trial court, however, found that the executor acted in good faith and that the sale to Stump was *bona fide*. Under our oft-repeated rule, our quest thus becomes one to determine whether those findings are supported by substantial competent evidence. (1 Hatcher's Kansas

Digest, rev. ed., Appeal & Error, § 505, p. 205, § 507, p. 206; 2 West's Kansas Digest, Appeal & Error, § 989, p. 589.)

The evidence was conflicting as to what Edward's one-half interest in the ranch was worth. For estate purposes, it had been appraised at $33,200.00, and there was some additional evidence to support that value. On the other hand, there was testimony indicating a singular lack of interest on the part of prospective land buyers, including witnesses called by the appellants, in purchasing an individed interest in this land, and the record contains independent evidence that $30,000.00 was a fair price. It is worth noting that Youngquist reserved the growing wheat crop, valued at better than $1,800.00, and that he also saved a commission of from $1,000.00 to $1,500.00 by making the sale direct to Stump.

There is evidence that Youngquist talked to many people about selling the property, including Finley's local attorney, from whom he got no response. It is true no inquiry was made of the appellants as to whether they might be interested in buying but, on the other hand, the appellants at no time prior to the sale expressed any interest in buying or made any offer of purchase. Although the appellants contend that Youngquist's lawyer assured their counsel they would be advised before a sale of the land was made, this contention finds no support in the admitted evidence. The record does disclose rejection of a proffer of proof, by appellants, containing hearsay, but this is not even argued as error.

Further analysis of the evidence relating to Youngquist's efforts to sell the land seem unnecessary, although we should add that Youngquist had refused Stump's first offer of $25,000.00, and had obtained approval of the probate judge to accept Stump's later offer of $30,000.00. We are constrained to hold that the court's findings of good faith are sustained by the record.

Since we hold that the appellants have not sustained their charge of bad faith against the executor, allegations that Stump is chargeable with knowledge of bad faith on the part of Youngquist become moot. Stump cannot be said to have notice, imputed or otherwise, of bad faith which the court found did not exist. However, there is a connected aspect of the charge which we feel requires comment.

Stump's notice is said to have been imputed to him by reason of his having employed the estate's attorney to examine title to the land which Stump bought from the estate. In view of what we

have heretofore said and held, it is unnecessary to enter into a discussion of when and under what circumstances knowledge of an attorney is imputed to his client, but those who are interested in the subject will find it treated in *Hess v. Conway*, 92 Kan. 787, 142 Pac. 253, cited by the appellants, as well as in 7 Am. Jur. 2d, Attorneys at Law, §§ 107-111, pp. 114-116.

While the attorney's action in examining the title for Stump cannot be said to vitiate the sale in this case, we suggest that his representation of both vendor and vendee, under the circumstances shown, may not have been in the best tradition of our profession. Canon 6 of the American Bar Association Canons of Professional Ethics deals with the representation of adverse interests and we think it imperative, if the legal profession is to attain the public respect to which it legitimately aspires, that attorneys act with the greatest circumspection in the representation of multiple clients where there exists a possibility that their interests may conflict or be at cross purposes.

The case at hand provides an illuminating example of the embarrassment which may result from a lawyer's failure to interpret strictly the admonition of Canon 6, even though representation may have been undertaken in the best of faith and no actual fraud may have been perpetrated on either client. The record here reveals that, as a result of his attorney's examination, Stump required this action instituted to perfect title. Suit was then brought in Stump's name by the estate, at estate expense and through the estate's attorney, to satisfy title requirements made by the same lawyer acting for the purchaser. The possibility that conflicting interests might result from such dual representation should appear obvious.

It is to the attorney's credit that he later withdrew from the case when the prospect developed that he might be needed as a witness, and that he then returned his fee to the estate. Such action on his part accorded with the import both of American Bar Association Canon 19 and of Opinion No. 9 of the Committee on Professional Ethics of the Bar Association of Kansas found on page 35 of the Handbook on Professional Ethics, recently published by our State Bar Association.

We have not overlooked the appellants' reference to the doctrine of reconversion, stated in 19 Am. Jur., Equitable Conversion, § 30, pp. 23, 24, as follows:

"It is a well-settled rule in equity that where a testator directs land to be sold and the proceeds thereof distributed among certain designated beneficiaries, such beneficiaries may elect, before the sale has taken place, to take the land instead of its proceeds. Where they have so elected *and sufficiently manifested their election*, the authority to sell the land cannot thereafter be exercised by the executor, but is extinguished. . . ." (Emphasis supplied.)

See also *Schneider v. Schneider*, 135 Kan. 734, 739, 12 P. 2d 834, where reconversion is mentioned.

It will be seen that the rule requires an election on the part of the beneficiaries. As to the manner and mode of election, it is said in 18 C. J. S., Conversion, § 53, p. 80:

"To effect a reconversion, the beneficiary should clearly and unequivocally express his intent to take the property in its original and unconverted form, as by positive declaration or conduct warranting inference of such intent."

It is apparent to us that the rule has no application to the facts presented here. There is no evidence anywhere in the record that the appellants ever signified an intent, either orally or through correspondence, to take Edward's half interest in the Drennan Ranch in its original form.

In terminating what has become a somewhat wordy opinion, we might say we have endeavored to treat all the salient points raised by a rather long record and discussed in the three supporting briefs. After carefully examining the evidence before us, and the authorities cited to us, we are forced to conclude that no error inheres in the judgment entered by the trial court, and that the same must be affirmed.

It is so ordered.