No. 47,396

STATE OF KANSAS, *Petitioner*, v. LLOYD ALVEY, *Respondent*.

(524 P. 2d 747)

Opinion filed July 17, 1974.

*Michael C. Cavell*, special assistant attorney general, argued the cause, and *Vern Miller*, attorney general, and *Curt Schneider*, assistant attorney general, were with him on the brief for the petitioner.

*Wm. E. Scott*, of Kansas City, argued the cause and was on the brief for the respondent.

*Per Curiam:* This is an original proceeding in discipline against respondent Lloyd Alvey who, as a member of the bar of this state, has been practicing in Kansas City, Kansas, since 1956. A hearing was held on the complaints by a three-man panel of the State Board of Law Examiners. The panel filed its report containing its findings and a recommendation that the respondent should be disciplined by indefinite suspension. The State Board of Law Examiners adopted the report of the hearing panel. The board found acts of misconduct with relation to three complaints. The complaints were based on the failure of the respondent to carry out matters entrusted to him, failure to respond to the inquiries of clients, and refusal to return papers of his clients after requested. The respondent filed his exceptions to the report of the board and the matter is here for review.

The complaints and the testimony relating to each of them are summarized as follows:

## I. COMPLAINT OF NORMAN MICHAEL

Mr. Michael employed the respondent to assist him in obtaining title to a trailer which Michael had obtained by virtue of a mechanic's lien. At that time respondent told Michael the title should be obtained in twenty to thirty days. Respondent began preparation of the procedure to obtain the new title, but for some reason which he cannot recall, he discarded his work and began anew. Apparently, respondent took the assignment under the impression the statute to apply was one he had used some ten years previously. For whatever reason, respondent admits he could not complete the assignment; that he is often behind in his work; and that he does not normally call his clients to inform them the work will be com-

pleted later than expected, although he recognizes that he should.

About forty-five days after the initiation of employment, Michael came to respondent's office and was told the project was almost complete and would be in a few days. It was not. Michael, acting upon this advice, sold the trailer soon after without knowledge that the promise was not fulfilled.

Michael made many inquiries by phone to respondent, usually talking with a secretary and often leaving a message for respondent to return the call. While respondent admits he received these messages, he did not respond because he had "no positive information" to give Michael. It is his normal office practice to hold all incoming calls so he can spend his time completing case matter before him.

On January 20, 1972, Michael, after unsuccessful attempts to reach respondent by phone, went to his office. Respondent was present and could be seen by Michael in the inner office. Without talking to Michael, respondent returned all papers concerning the title, feeling there was no reason to give any explanation for the delay. Michael then employed other counsel to complete the transaction.

The respondent, during this time, was employed as attorney for the Wyandotte County Welfare Board. He recognizes that if he knows he cannot complete an assignment for his client, he should advise the client so he may seek other assistance. He admits he does not spend as much time as he should in reviewing the Kansas Statutes and Kansas Reports.

## II. Complaint of Mary Rippey Russell

Mrs. Russell employed respondent to assist her in obtaining back alimony and support payments that arose out of her Georgia divorce. Respondent admits receiving correspondence and undertaking the employment, but he simply put the case aside and did not complete it. Mrs. Russell, after some time, began to inquire as to the status of the case and although she wrote many times and called once, respondent did not reply.

The respondent was hospitalized during a portion of the time he had Mrs. Russell's case. Prior to his hospitalization, he admits neglecting his practice while he was employed full time with the office of the city attorney, to which he devoted most of his time. He also spent five hours weekly as attorney for the Wyandotte County Welfare Board. He admits that with knowledge he is behind on his case work, he accepts additional work and spreads

himself too thin. He also admits it is no service to his clients to accept employment he knows he cannot complete.

### III. Complaint of Aileen Primm

The complaint of Aileen Primm grows out of a real estate transaction. Her original contact with respondent was when she purchased the property at which time respondent represented the sellers. Later, in 1968, she sold the property to some people named O'Neal. Respondent drew up the contract of sale which was signed by all the parties. Thereafter, although she had fully performed on her contract and delivered her deed to the purchasers, the purchasers failed to make the payments required of them; and on April 11, 1970, she employed respondent to take whatever action was necessary to collect the balance due on the purchase price or to recover the real estate.

Mrs. Primm's testimony was that she tried on numerous occasions during that time to contact respondent by phone, by correspondence, and by trips to his office; but respondent refused to answer her correspondence and failed to return her call when she left her number, and when she visited the office he was either out or refused to see her. Respondent advised her he was working on the case, and on one occasion advised her the case had been filed and he was in the process of getting service on the defendants. Later, respondent testified this statement was untrue. Finally, she requested that respondent return her file and all papers she had given him, including the letter acknowledging the indebtedness, and he refused to return her papers. She also requested he return the $50.00 retainer fee she paid him for the litigation involved in collecting the indebtedness or recovering the real estate. Respondent did not return the retainer.

Mrs. Primm testified she finally employed James W. Dahl of Kansas City, Kansas, and instructed him to secure her papers from respondent and proceed with the case. Dahl made demand on respondent for the papers, and respondent refused to release them. Mrs. Primm testified that in 1972 she had an opportunity to sell the property to another party if she could recover it from the O'Neals. She advised respondent of this opportunity and of the urgency of proceeding with the litigation. Respondent promised to recover the property for her right away, but he failed to do so.

The respondent testified that he could not remember being paid an attorney's fee to collect the money due on the sale of the

property or to recover the property; but he acknowledged it was his signature which appeared on Exhibit 2, a receipt dated April 11, 1970, showing payment to him of a $50.00 retainer fee.

Regarding service of process on him for the hearing which was to be held on October 1, 1973, respondent stated he received notice of the hearing along with a copy of Mrs. Primm's complaint on August 28, 1973. He further testified he did not disagree with and did not challenge statements made by Mrs. Primm in her letters of complaint introduced in evidence. In response to a question from a member of the panel as to whether respondent had told Mrs. Primm that suit had been filed when it had not, respondent replied he did not remember whether he had given her that information. He stated the primary reason he wanted to be heard by the board was not to contradict testimony, but to apologize for his failure to appear at the time and place he was notified to appear on the complaint. He denied he had refused to turn the file over to Dahl and stated he would immediately return Mrs. Primm's file to her.

The respondent complains he should have been notified of specific disciplinary rules he violated. He asserts copies of complaints prepared by lay citizens and served on him were not sufficient to inform him clearly and specifically of the acts of misconduct with which he was charged. He further argues the board's report found him guilty of several acts of misconduct which were not set forth in the complaints. Respondent attempts to apply the rules relating to the military justice code and the code of criminal procedure as to specificity of charges, to the procedure for disciplining attorneys.

K. S. A. 1973 Supp. 7-103 provides the Supreme Court may make such rules as it may deem necessary for the discipline and disbarment of attorneys. Pursuant to the statute, this court, on February 11, 1970, adopted the Code of Professional Responsibility (effective July 1, 1970). The Code of Professional Responsibility was adopted by the House of Delegates of the American Bar Association on August 12, 1969, to become effective on January 1, 1970. The code required years of study and research. It has three separate, but interrelated parts: Canons, Ethical Considerations, and Disciplinary Rules. The Canons are statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers in their relationships with the public, with the legal system, and with the legal profession. The Ethical Con-

siderations are aspirational in character and represent the object-ives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations. The Disciplinary Rules, unlike the Ethical Considerations, are mandatory in character. The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action. The code makes no attempt to prescribe either disciplinary procedures or penalties for violation of a disciplinary rule.

Every lawyer in this state should be familiar with the Code of Professional Responsibility. He should continuously seek to under-stand the obligations and duties placed on him by its provisions. It should be assumed that he knows certain kinds of conduct, gen-erally condemned by responsible persons, will be grounds for disci-pline. The disciplinary rules of the code, having been adopted pursuant to statutory power, have the force and effect of a statute; and conduct of any attorney licensed by this court to practice law in this state may be subject to discipline if his conduct falls below the standards contained in these rules.

Since it is incumbent on an attorney to know the disciplinary rules regulating his profession we must conclude that the failure of the State Board of Law Examiners to set forth the specific discipli-nary rules violated by respondent cannot be a basis for avoiding *discipline.* This is in accord with our statement in *State v. Nelson,* 206 Kan. 154, 476 P. 2d 240:

". . . We must conclude that where the facts in connection with the charge are clearly set out in the complaint a respondent is put on notice as to what ethical violations may arise therefrom. It is not required that the com-plaint contain a reference to the specific canon of ethics which may have been violated." (p. 157.)

The respondent's claim that he was found guilty of acts which were not set forth in the complaint is based on Kansas Supreme Court Rule 207 (*b*) and *State v. Berkley,* 214 Kan. 571, 520 P. 2d 1255. Rule 207 (*b*) requires that the complaints set forth charges with sufficient particularity to inform the attorney clearly and spe-cifically of the acts of misconduct with which he is charged. In *Berkley,* the respondent bankers were charged with advertising and soliciting and the board found them guilty of violating DR 5-101 (A) relating to conflict of interest. The facts supporting the adver-tising and soliciting charge were not the same facts as those sup-

porting the conflict of interest charge. Under these circumstances we entered judgment for the respondents.

The conclusion of the board in this case reads as follows:

"The panel concludes from the testimony on these complaints that the evidence clearly shows the respondent has allowed himself to fall into a course of conduct in his practice of law to the extent he has established a course of conduct and way of doing business in the practice of law that is contrary to and in violation of the Code of Professional Responsibility in that he accepts and assumes the responsibility for litigation when he knows he does not have sufficient time, inclination or physical stamina to do the necessary research to properly handle such matters, and in some instances accepts litigation when he does not have sufficient information and skill in the law to handle such matters without extensive research, knowing that he does not have the time to properly research the new questions involved. Because of his insufficient knowledge of the proper procedures to follow and his lack of time for research in that subject matter caused by the press of other cases he has accepted, he inordinately delays and fails to handle the prosecution of such matters. From the complaints presently before the Board, respondent's own statements and the statements of his counsel, he is not able to properly represent his clients and his attempts to so do and his refusal in many instances to turn over cases to other lawyers when requested so they can be properly handled reflects upon the integrity of the bar, is contrary to the public interest and causes contempt and criticism of both the bar and the courts, and that no change or improvement has been made in such conduct during the past year while these matters have been pending before the Board with the full knowledge of respondent. Respondent has failed, refused and neglected to advise with investigators appointed by the State Board of Law Examiners and by local grievance committees investigating his conduct in various cases, and in fact has such slight regard for the disciplinary procedures of the State Board of Law Examiners, an arm of the Kansas Supreme Court, even to the extent of failing to appear at a time and place set for hearing before a panel of that Board, that discipline of a lesser extent than suspension would be unavailing to correct the conditions hereinbefore recited. That respondent has violated the following provisions of the Code of Professional Responsibility and Canons of Judicial Ethics, to-wit: DR 1-102 (A) (6), DR 2-110 (B) (3), DR 6-101 (A) (1) (2) (3) and DR 7-101 (A) (2)."

We have viewed the complaints of the lay citizens which were served on the respondent. The factual bases for the complaints were limited to a failure of respondent to perform the agreed services, failure to communicate with the clients, and failure upon request to return papers entrusted to respondent. The conclusions of the board, prepared by its lawyer members, were all related to the relationship between the three complainants and the respondent although extending beyond these basic factual complaints. They were necessarily more detailed and sophisticated than the written complaints of the lay citizens. The complaints were sufficient to

place respondent on notice of the incidents out of which his misconduct arose. Respondent cannot logically claim he was found guilty of acts of misconduct he could not have anticipated. It is not incumbent on the board to notify the respondent of charges of specific acts of misconduct as long as proper notice is given of the basic factual situation out of which the charges might result. This is plainly distinguishable from the conclusion in *Berkley*. In *Berkley*, the notice served on the respondents did not recite the factual situation which was the basis for acts of misconduct relating to a conflict of interest.

Respondent also complains that the recommendation of the board of discipline by indefinite suspension was unreasonably harsh. To support this argument he reviews many of our disciplinary cases, reciting the facts and the resulting punishment. He points out that in none of our cases has indefinite suspension been imposed unless there was venality, dishonesty, or moral turpitude involved. He emphasizes that *In re Carson*, 205 Kan. 456, 469 P. 2d 349, is the only disciplinary case before this court which has any similarity with the present case. The respondent, Carson, was charged with neglect of his client's business and was publicly censured.

As heretofore stated, no punishment is provided in the Code of Professional Responsibility. Rule 207 (*n*) provides that recommendations of the board as to punishment may be (1) private censure, (2) public censure, (3) suspension for a definite or indefinite period, or (4) disbarment; but the nature of the punishment is not limited to these designations. The rule provides no guidelines for categorizing acts of misconduct in any one of the suggested forms of punishment. The only limitation on punishment is the collective conscience of this court. We recognize that a pattern has developed to some extent in our disciplinary cases, and that we should strive for consistency in the exercise of our judicial judgment. We are inclined to believe, after careful consideration of all the facts and circumstances in this case, that the punishment of public censure is more appropriate for respondent's acts of misconduct than indefinite suspension.

It is therefore by the court considered, ordered and adjudged that Lloyd Alvey be and he is hereby censured by this court. Costs of this proceeding are taxed to respondent.