No. 47,445

STATE OF KANSAS, *Petitioner*, v. RONALD W. MAYES, *Respondent*.

(531 P. 2d 102)

Opinion filed January 25, 1975.

*Michael C. Cavell,* special assistant attorney general, argued the cause, and *Vern Miller,* attorney general, and *Curt T. Schneider,* assistant attorney general, were with him on the brief for the petitioner.

*Ronald W. Mayes,* argued the cause, *pro se.*

*Per Curiam:* This is a disciplinary proceeding against Ronald W. Mayes, a member of the bar of this court. The board of law examiners has recommended that the respondent be disbarred. We concur in that recommendation.

The respondent was admitted to practice law in this state in 1965 under our reciprocity rule. He had previously been admitted in the District of Columbia. He established an office in Wichita, where his practice was confined almost exclusively to patent law and related matters. In the spring of 1972 two separate complaints were lodged against him which form the basis of this proceeding. One was by George M. Boyd, the other by Larry Honn. Both are inventors who had employed respondent to file patent applications. While unrelated factually, each complaint generally charged respondent with overzealousness in the pursuit of his fees, neglect of the legal matters entrusted to him, failure to carry out his contract of employment, refusal to consult with his client, and prevarication in such communications as he had.

Respondent filed no written answer to either complaint, but did appear personally before the hearing panel and participated in two days of hearings on May 8 and 9, 1973. The panel submitted its report to the board of law examiners, which amended it and filed it with this court, as amended, on February 20, 1974. Those portions of the amended report containing the board's findings of fact and conclusions of law as to the two complaints are annexed to this opinion as an appendix and incorporated herein by reference.

On March 25, 1974, respondent filed a "Statement of Exceptions" to the board's report, in which he took "general exception" to the report. The record was served upon him on April 9, 1974, making his brief due on May 9, 1974 under Rule No. 208 (e) (2). On

respondent's successive applications he was granted four separate extensions of time to file his brief until, respectively, June 8, 1974, July 8, 1974, August 15, 1974, and September 15, 1974. Further requests were denied, and respondent filed no brief to support his "exceptions."

In the meantime respondent filed, at various times from June 19, 1974, through October 22, 1974, thirteen separate "motions to dismiss," aimed at various specific conclusions of the board as to the Disciplinary Rules that had been violated. These were each overruled, some with leave to renew at the hearing on the merits.

Although by failing to file a brief respondent waived argument on the board's findings of fact (Rule No. 208 [e] [4]), he nevertheless appeared personally before this court and made a full argument on his own behalf. That argument was addressed largely to factual matters, and he was permitted to exceed the time for argument normally allotted. The court had an opportunity to observe his attitude and demeanor. Before this court respondent was truculent, evasive, unresponsive to the court's questions, and generally lacking in candor.

There is no need for the court to recount in detail respondent's dealings with the two complainants; they are contained in the appended report of the board. We have independently examined the 472 page transcript of the hearing and the numerous and voluminous exhibits offered by respondent, and we have re-examined respondent's various motions to dismiss. We find ample support for the board's findings and conclusions.

The most serious aspect of the Boyd complaint is that after Boyd's patent application was filed respondent refused to prepare a response to the patent office's "action letter" until he was paid fees claimed in the amount of $616.74—even though failure to file the response in just over thirty days would result in an abandonment of the patent application and a complete loss of the idea Boyd had developed over a period of several years. Boyd and his associates had already paid respondent $2185.00 in fees and expenses; when asked to account for this sum, respondent refused to do so *unless paid an additional fee for preparing an itemized statement*. Respondent failed to keep an appointment with Boyd to discuss the matter, and indicated he no longer wished to talk to Boyd. To salvage the work already done Boyd was required to hire other counsel to meet the patent office's requirements.

Respondent's attitude toward his professional responsibility is reflected in the following exchange when he was a witness before the board:

"Q. Well, did you not feel some obligation after undertaking this work to secure the patent?

"A. No My—I'm a contract worker. They pay me to do something, I do it, and that's it.

"Q. They had already paid you or you had been paid $2,185 from these people?

"A. It has been accounted for. It is contract work. I was paid in advance in those cases for the work I did. For the work I did, I got paid in advance. I got paid my fee for preparing and filing the patent application, and that was it. I have no obligation to them other than what I contracted to do. That is the way the patent business is run, and she's a toughy."

We agree with the board's conclusions that by this conduct respondent neglected the legal matters entrusted to him (DR 6-101 A [3]) and placed his client's rights in jeopardy (DR 7-101 A [3]). Such conduct was also prejudicial to the administration of justice (DR 1-102 A [5]) and reflected adversely on his fitness to practice law (DR 1-102 A [6]).

By way of defense to this charge respondent asserted, before the board, in his exceptions, and before this court in oral argument, simply that Boyd was not a "client" to whom he owed any duty. The real "client," he asserted, was the group consisting of Boyd and his two associates, forming some sort of legal entity (which he does not name) distinct from the individuals who comprised it. Hence, he says, he was not required to conduct himself like a lawyer in his dealings with Boyd. We regard the assertion as disingenuous. Boyd was the inventor in whose sole name the patent application was filed, and Boyd individually was the sole addressee and recipient of respondent's final bill for services. These facts, by themselves, are sufficient to make Boyd a client to whom respondent owed a lawyer's duty of fidelity and loyalty.

In his dealings with Honn respondent asserted once again his inflexible rule that he did no work until paid in advance. Honn paid him $100 on August 31, 1970, and $900 more on December 15, 1970. The first $400 of this $1,000 was for patentability searches which were in fact performed. Whether the $600 balance was for one patent application, as Honn claimed, or a down payment on a $2,400 fee for four applications, as respondent claimed, is immaterial. The fact remains, and respondent admits, that no applica-

tions were prepared until more than a year later, in early 1972. In the meantime, in early 1971, Honn's repeated requests to see respondent's rough drafts were met by repeated evasions. Respondent assured Honn that the work was progressing, but repeatedly failed to keep appointments with his client. When they did meet, respondent said the files were at home.

Honn despaired of any results, and from March, 1971, until January, 1972, there was no contact at all between respondent and Honn. Then, on January 20, 1972, respondent renewed his contact with Honn. He demanded $1,700 in fees claimed to be due, with interest at 12% per annum from November 23, 1970. Honn's renewed efforts to see any sign of respondent's work product met the same fate as those of the previous year. Although respondent concedes the applications were not in existence, he told Honn they were "at home."

Honn once again gave up, and failed to keep his next appointment with respondent. Respondent, however, and in spite of his rule of "no pay—no work," proceeded to prepare four patent applications and then sued Honn for $1,700 in fees. In magistrate court the judgment was in favor of Honn. An appeal to district court had been tried and was pending at the time of the hearing before the panel in this proceeding. Since that time judgment was rendered in favor of respondent for the fees claimed. Among respondent's motions was one to make the journal entry of that judgment a part of the record in this proceeding. Although the motion was overruled at the time it was filed, the journal entry is of record in this proceeding and has been considered by the court in reaching its conclusion herein.

It appears that the judgment in respondent's favor is based on a lack of evidence in that action (a) that Honn ever formally discharged respondent and (b) that respondent's services were not reasonably worth $2,700. It amounts to a finding that, based on the law of contracts and the rules of the market place, Honn owes respondent his fees. It does not excuse the year's delay in attending to the matters entrusted to him (DR 6-101 A [3]) or the failure to carry out his contract of employment within a reasonable time (DR 7-101 A [2]). Neither does it excuse the repeated failure to keep appointments with his client, his failure to communicate with his client for nine months, or his admitted lies as to the progress of his work and its whereabouts. Respondent's pattern of conduct

toward his client was unworthy of a member of the bar of this court (DR 1-102 A [6]).

Respondent's defense to the Honn complaint, as set out in his statement of exceptions, was as follows:

"For emphasis, all matters transacted with Honn was on contract dealing with a patentability search of an invention disclosure and the preparation of four patent applications if sufficient patentable subject matter could be found in the invention disclosure. All of this was strictly within the province of the Patent Office. A registered patent agent could have handled it."

This is a recurrent theme of respondent's, running through all of his testimony, motions and argument. He takes the position that as a patent attorney he is bound by different standards of conduct than an ordinary lawyer, and that only patent attorneys are competent to judge him. We reject that contention. As a member of the bar of this court he is bound to observe the Code of Professional Responsibility adopted by this court as Rule No. 501 (214 Kan. lxxv). The canons and rules "voice general standards of behavior required of members of the legal profession and define a level of conduct below which no attorney may fall without making himself liable to disciplinary action." (Ibid.) See *State v. Alvey*, 215 Kan. 460, 463-4, 524 P. 2d 747. Respondent cannot evade his responsibility to this court, to the bar and to the public, by asserting that he was performing services which could lawfully be performed by a non-lawyer. See *State v. Schumacher*, 214 Kan. 1, 10-11, 14-17, 519 P. 2d 1116.

Finally, the board found that respondent's conduct at the hearing before its panel violated numerous Disciplinary Rules, listed in its summary. While the board's discussion of these infractions is omitted from the appendix, our examination of the record reveals that the board's findings are fully justified. Respondent's attitude toward these proceedings is reflected in the following excerpt from his exceptions:

"Respondent also herewith elects to put in issue and does put in issue the qualifications and ethics as attorneys and where applicable the judicial code of ethics of the judiciary of all members of the Kansas Bar and especially the prosecuting attorney for the State of Kansas in this case, the three Law Examiners in this case and the members sitting on the Kansas Supreme Court, in the matters of the report and the complaints, and the related activities of parties preliminary thereto."

Similar unwarranted aspersions on the integrity of the attorney general and his assistants, the board of law examiners, and the bench and bar abound in the record. Without regard to whether

this conduct would be grounds for discipline standing alone, we have considered it as relevant to the disposition of the violations charged and proven under the two complaints.

We agree with the board that respondent "is guilty of disregarding the duties of honesty, fidelity, candor and fairness he owes to his clients, the complainants herein, and that he is an unsafe person to manage the legal affairs of others."

The respondent is disbarred.

## APPENDIX

### REPORT, FINDINGS AND RECOMMENDATIONS OF HEARING PANEL

#### THE COMPLAINT OF LARRY HONN

LARRY HONN, hereinafter referred to as Honn, complains generally that he hired respondent, RONALD W. MAYES, hereinafter called Mayes to cause a patent search to be conducted on four ideas or inventions, and, later, to prepare a patent application on the most promising one of the ideas; that although he paid a total of $1,000.00 (representing $400.00 for the patent searches and the $600.00 fee for one (1) patent application) he was not shown the application until sued by Mayes about a year and one-half later in the Court of Common Pleas of Sedgwick County for an additional fee; that while he made several trips to Mayes' office to see the application, when he arrived it was always at Mayes' home or Mayes did not keep the appointments, all as set out in his complaint, a copy of which is attached hereto marked "Complainant's Exhibit 1" and made a part hereof.

Mr. Mayes did not file a written answer to the complaint, but, as gleaned from his testimony, he claims that there was initially an oral agreement between he and Honn to conduct a patent search on Honn's ideas and that Honn would be charged $100.00 for each search made by the professional searcher in Washington, D. C.; that only three (3) such searches were made; that when the search report was received and the matter discussed with Honn an agreement was made wherein Honn agreed to pay $2400.00 for four (4) patent applications; that Honn paid $100.00 at the initial office conference on August 31, 1970, and $900.00 on December 15, 1970; that the total payment represented payment of $300.00 on the

searches and $700.00 to apply on his fee of $2400.00; that Honn promised to pay the balance of $1700.00 owing to him but never did; that Honn had been told that his total fee was due in advance.

After hearing all evidence and taking the matter under advisement the Panel finds as follows:

That on August 31, 1970, Mayes and Honn had their initial conference in Mayes' office and discussed Honn's ideas or inventions; that Honn had three (3) ideas he presented to Mayes and as a result of their conversations a fourth idea developed; that Honn authorized Mayes to conduct a patent search of the information disclosed in the four (4) ideas; that Honn paid $100.00 to Mayes at the initial conference and agreed to pay $100.00 for each search made by the professional searcher in Washington, D. C. (hereinafter called Halpert); that Mayes told Honn that four (4) searches would be run. During this conference Mayes told Honn that in preparing a patent application he would prepare a rough draft and then he and Honn would go over it, correct it, and keep making rough drafts until they got it right; that several telephone and office conferences were had between Mayes and Honn during the time the searches were being made, both to discuss the progress of the searches and to discuss details of the ideas.

That on October 23, 1970, an office conference was had between Mayes and Honn during which they discussed the results of the patent search; that Halpert had conducted the patent search in Washington, D. C. in the Patent Office, and had made his report by letter to Mayes, enclosing copies of several patents touching on or relating to Honn's ideas; that the letter report of Halpert was not shown to Honn but the enclosed patents were reviewed by Honn and copies of some of them made in Mayes' office and given to Honn during the conference.

That during the October 23, 1970 conference Mayes told Honn that all four ideas were patentable in his opinion; that at this and subsequent conferences Mayes told Honn that it would be easier to prepare all four applications at the same time; that an attorney's fee of $600.00 per patent application was quoted to Honn; that a copy of a statement from Mayes to Honn dated October 20, 1972, indicating that charge is attached hereto marked "Respondent's Exhibit A" and made a part hereof; that Honn told Mayes that he did not have the money for all four applications and he wanted to work with Mayes on a cash basis only; Honn authorized and agreed to

pay for preparation of one (1) patent application and promised to pay the $600.00 attorney's fee and the balance of the search fee at a later date.

On December 15, 1970, Honn paid $900.00 to Mayes; that it was represented to Honn, and he understood, that this amount represented a $300.00 balance on patent searches of four ideas and the agreed fee of $600.00 for preparation of one patent application; that thereafter several office and telephonic conferences were had between Honn and Mayes during January, February and March of 1971 concerning technical details of the application and inquiries concerning the status of the preparation of the application; that Mayes told Honn the matter was coming along; that during the months of January, February and March of 1971, Mayes told Honn that the application was prepared and made appointments to see Honn in his office; that when Honn came to the office, Mayes would either (1) not keep the appointment (be out of the office); or (2) state that the applications were left at home; that this happened about six or eight times altogether; that each time Honn would travel from his home in Great Bend (and later, Sedgwick) to Wichita.

That some time during the period of January, February and March of 1971 Mayes sent Honn a letter demanding payment of $1700.00 and enclosed a promissory note for that amount; that the note called for interest at 1% per month on the unpaid balance until paid; that Honn threw the note and letter in the waste basket; that Honn determined that since he had received nothing for his money and was not able to see the rough draft of the application that he was wasting his time and determined to drop the entire matter; that he did not communicate that decision to Mayes.

In the ensuing months of the year 1971 there was no contact between Mayes and Honn; that in January of 1972 Mayes attempted to and did regain contact with Honn, discovering that Honn had, during the interim, moved to the City of Sedgwick, Kansas; that Mayes made demand for the attorney's fees of $1700.00 plus interest at 1% per month from November 23, 1970; that a copy of his letter to Honn, dated January 20, 1972, is attached hereto marked "Respondent Exhibit D" and made a part hereof; that Honn again attempted to see the patent applications which Mayes stated were prepared and went to Mayes' office; that Mayes again stated the application was at home; that another office appointment was made to go over the applications which Honn did not keep.

That in a subsequent conversation on the telephone Honn finally told Mayes he considered he was wasting his time and told Mayes not to do anything further on the matter; that he hadn't received anything for his money and was not going to pay any more money.

The panel further finds that Mayes finally prepared four (4) documents, which he stated were the technical parts of the four (4) applications; that these were not prepared until after Honn told Mayes he would not pay any more money and not to do any more work on the matter; that they were prepared sometime between January 20, 1972 and March 9, 1972; that they were prepared incident to a lawsuit against Honn for the recovery of the fees Mayes claimed Honn owed him; that these applications were not shown to Honn until the trial in the Court of Common Pleas.

That in April of 1972 Mayes sued Honn in the Court of Common Pleas for the recovery of the fees and interest at the rate of 12% per annum; that a copy of the Bill of Particulars is attached hereto marked "Complainant's Exhibit 2" and made a part hereof; and, upon trial of the matter, the Judge of the Court of Common Pleas found against Mayes; that the matter was appealed by Mayes to the District Court of Sedgwick County; that at the time of the hearing before this panel the matter had been tried in the District Court and was under advisement.

That Honn made demand for the return of his papers and the application which Mayes had indicated was prepared but that Mayes refused to turn the documents over to Honn.

### Discussion

It should be clear at the outset that the panel's findings, discussions and conclusions in this matter relate only to Mr. Mayes' conduct as an attorney and not as a patent attorney. Mr. Mayes correctly points out that none of the panel members are patent attorneys and while evidence was received (including expert testimony) relating to patent procedures, patent terminology, interpretations of the four patent applications prepared by Mayes and whether or not they were or were not in fact Honn's ideas and related matters, the panel makes no findings on these matters and does not draw any conclusions therefrom.

The record is abundantly clear that Mayes had agreed to prepare one application for a fee of $600.00, but he refused to do so until he received additional monies which Honn had not agreed to pay.

Little weight can be given to Mr. Mayes' testimony because of the

inconsistency of his statements—Mr. Mayes himself stated a fee of $600.00 per application was quoted but insists this was on the basis of preparing four applications. The $600.00 per application fee with no reference to the number of applications is stated in Respondent's own exhibits (Respondent's Exhibit A). While Mayes on the one hand maintains there was an agreement in October and November of 1970 for a total fee of $2400.00 for four (4) applications, he later contradicts himself stating that until he had thoroughly gone over the search material from Halpert and information received from Honn he did not know how many applications he would have had patentable subject matter for; that he did not know until January or February of 1971 whether he had sufficient information for four applications and that it would have been impossible for him to have entered into an agreement in October of 1970 that four (4) applications would be filed. He was therefore unable to determine in October or November of 1970 what the precise fee would be.

It is likewise difficult for the panel to accept Mr. Mayes' testimony concerning the preparation of the applications. He maintains on the one hand that he does not do work until he is paid, but that notwithstanding this practice he does ultimately prepare the four applications nearly fifteen months after he last received money from Honn and even though he was not paid for all four. Mr. Mayes states:

"When you make a deal with a man, you've got to carry your end of the bargain, but if you know you're not going to get paid, what are you supposed to do? Well, I didn't know I wasn't going to get paid. Well, I was supposed to mitigate damages in this case. If he would have been honest with me in 1971 he might have gotten off with the thousand dollars, but he strung me, he really strung me. Now I know the law and I know all the options on this thing. But I have the problem with other clients, when we have a problem, what do I do? Do I go ahead and work my head off and put in hundreds of hours and hope to come up with what he agreed to pay me? Or do I throw the whole thing in the wastepaper basket and forget the whole thing?" (T-343).

Mayes answers his own question in other parts of the transcript and among others, at T-332

". . . he (sic Honn) said 'How is the work coming along?' I said, 'You get the work when I get paid.' It was like it was agreed. He said, 'Well, I'm in your office now. Let's see what you've done.' He was a very aggressive individual and I said 'It's at home'."

Notwithstanding his practice of not doing the work until he's paid, it was Mayes who renewed contact with Honn in 1972; it was

Mayes who prepared applications long after there was ample indication he would get no more money until Honn had seen the first application in rough draft form.

The conclusion is inescapable that the applications were not prepared incident to his employment by Honn, but were prepared to support his lawsuit.

Mr. Mayes' position is made further unclear by his statement:

"You see, and once I've taken a deposit, I'm obligated to carry it through and that is my conclusion in this case." (T-343)

The panel agrees with Mr. Mayes' conclusion. He was obligated to carry through—but he didn't. It is clear that in this respect Mr. Mayes violated DR 6-101 A (3) in that he neglected a matter entrusted to him; and DR 7-101 A (2) in that he failed to carry out a contract of employment entered into with a client for professional services.

When Mayes told Honn the applications were prepared, and, at other times, were at home, Mayes violated DR 7-102 A (5) in that he knowingly made a false statement of fact since at the time such statements were made the applications had not been prepared.

The panel further finds that Mayes refused to deliver the applications and papers of the client although the client requested them, all in violation of DR 9-102 B (4).

When he charged interest at the rate of 1% per month on alleged unpaid balance of his fee Mr. Mayes violated the provisions of K. S. A. Supp. 16-508 and DR 2-106 A in that he charged an illegal rate of interest on his fee.

### COMPLAINT OF GEORGE M. BOYD

George M. Boyd, hereinafter called "Boyd", complains generally that respondent procrastinated in handling his patent matters, refused to continue processing his patent application, jeopardized his patent rights, refused to provide an accounting for the charges respondent made, and refused to meet with him and discuss the billing. Mr. Boyd additionally complains of the manner in which a corporation set up by Mayes for Boyd and others was not a sound business and proper safeguards were not included, all as set out in his complaint, a copy of which is attached hereto marked "Boyd Compl. Exh. 1" and made a part hereof.

Mayes did not file an answer to the complaint with the Board. Mayes' position, as gleaned from his testimony, generally was that he was hired by the corporation, paid by the corporation and dealt

with Mr. Simpson. That he was a contract worker who didn't work until he was paid and that he was not paid the final bills; that he was holding Boyd's papers on the second patent application until he was paid and refused to perform any more work until he was paid.

After hearing all the evidence, and taking the matter under advisement, the panel finds as follows:

That there is insufficient evidence upon which to sustain a complaint of misconduct on Mayes' part in connection with the forming or operation of the Corporation.

Boyd, a retired Major in the U. S. Air Force, developed an idea called "Dial-A-Base" while in the Air Force as a radar officer, which device or idea was a navigational aid for use by pilots and navigators. Boyd had been a Radar Officer in the Air Force and was knowledgeable in navigation. He had offered the idea to the Air Force and they had told him to patent it himself.

The idea was a device that portrays the academic information in the cockpit in a precise way, shows the distance and heading from one position to another, pre-plotted in circular chart form, and contains other precise aviation information related to the same area. It is a map and a new map concept.

That Boyd discussed the idea with Lee DeMoss and Wayne Simpson, advertising men, who suggested forming a corporation to exploit the commercial potential of the idea.

That the three men contacted Mayes in the early part of 1970 to form a corporation and get the idea patented. That Articles of Incorporation for Boyd-Simpson-DeMoss, Inc. were prepared and filed with the Secretary of State on April 17, 1970. That on March 23, 1970, Mayes was paid $400.00 for his work in incorporating Boyd-Simpson-DeMoss, Inc.

That on February 6, 1970, DeMoss and Associates paid $100.00 to Mayes to cause a search to be conducted in the U. S. Patent Office relating to the idea. The patent was to become a part of the corporate assets.

That Boyd discussed the results of the search with Mayes and Mayes was authorized to prepare a patent application on the navigational aid. That Mayes was paid $600.00 on March 19, 1970, for preparation of a patent application. That subsequently Mayes and Boyd conferred and ultimately went over a rough draft of the application. That on July 30, 1970, the final patent application was

prepared and sent to the Patent Office for filing. That a check in the amount of $275.00 dated July 29, 1970, drawn on the Boyd-Simpson-DeMoss corporate account, was issued to Mayes for the patent application filing fee. That on July 29, 1970, Mayes was paid an additional $800.00 drawn on the account of DeMoss Associates for legal fees but Boyd did not know what work these fees represented.

That part of the fees paid Mayes were paid by DeMoss Associates, a business entity with which Boyd was not connected. That while Boyd was on active duty with the Air Force, Simpson was the chief executive officer for Boyd-Simpson-DeMoss, Inc., and conducted many of the affairs with Mayes. Simpson was also connected with DeMoss Associates. While Mr. Simpson did not testify, it was agreed that Mayes might secure an affidavit from Simpson and submit it as a part of the record (and if the Attorney General so desired, Simpson's deposition would be taken to afford the Attorney General an opportunity to cross-examine). No such affidavit has been filed by Mayes and he is presumed to have waived this privilege.

On November 5, 1971, Boyd, as president of Boyd-Simpson-De-Moss, Inc., wrote Mayes a letter, the original of which is attached hereto marked Exhibit "3" and made a part hereof, terminating Mayes' services as the full-time corporate attorney of Boyd-Simpson-DeMoss, Inc. and requested Mayes to forward all papers belonging to the corporation to the corporate address, 1009 East Second Street, Wichita, Kansas.

Mayes and Boyd had several conferences by phone and in the office during November and December of 1971 and January of 1972.

On November 30, 1971, Mayes claims he sent a letter to Boyd at the above corporate address enclosing the original corporate papers and claims that attached to that letter was a detailed statement of Mayes' fees and expenses for his services. A copy of this letter and statement is attached to this report marked "Boyd Respondent Exh. B 5-9-73" and made a part hereof. This statement shows a balance due Mayes of $594.24. Boyd claims he received no such statement.

Boyd did receive Mayes' letter of January 18, 1972, which is attached hereto marked "Boyd. Comp. Exh. No. 2,5-9-73" and made a part hereof. This letter notified Boyd:

"Enclosed is my statement in the amount of $616.74. Your pending United States patent application SN 59,634 entitled "Navigation Aid" will be held

abandoned unless a complete response is filed in the U. S. Patent Office on or before February 22, 1972, to the Office Action dated November 22, 1971. My fees are payable in advance and the enclosed statement must be paid up to date in time to permit me to prepare the proper response to the U. S. Patent Office."

In December of 1970 and January and February of 1971 Boyd contacted Mayes saying he never received any statements of accounting of Mayes' fees and expenses and tried to get Mayes to give him an accounting. An appointment was made for Boyd to meet with Mayes to discuss the matter but Mayes didn't keep the appointment. Boyd waited for over an hour for Mayes to show up. Boyd testified that later he called Mayes and Mayes told him

". . . I remember specifically he had been out shopping and he said 'Well, I don't want to talk about that anymore, and I don't want to see you any more' and that was the end of it."

That on February 2, 1972, Boyd wrote Mayes a letter, the original of which is attached hereto marked "Boyd Compl. Exhibit #4, 5-9-73" and made a part hereof, in which Boyd stated:

". . . We have asked for a complete accounting of your services and you have determined that this is an additional cost to us. Apparently you believe that you have sent an itemized billing to us. Our records do not indicate your billing. Another point which might have contributed to our misunderstanding is that work accomplished by your firm for BSDI is work accomplished for George M. Boyd. BSDI and George M. Boyd are one and the same in this matter.

In view of the above, we no longer need your services as either our corporate attorney or our patent attorney. Sufficient money has already been paid to you for the patent protection required. Please forward all records and patent applications with the appropriate Patent Office correspondence to me regardless of their state of completion without further delay. Not later than 3 February, 1972."

Mayes did not return those requested documents.

In the several times that Boyd talked to Mayes concerning an accounting, Mayes agreed to provide an accounting but stated he would have to go back through his records and would have to charge Boyd for the work.

Mayes testified that the $600.00 received by him on March 19, 1970, was a deposit to apply on the cost of the first patent application but that this was later switched to a deposit to apply on preparation of a second patent application; that the cost of the first application was $1,085.00 including the filing fee. This was paid by the two checks dated July 29, 1970; that the $616.74 additional fee owed to him included a $200.00 charge to prepare the response to the patent office Action Letter and other expenses in connection

with the corporation and other matters as related in his letter of November 30, 1971, to Boyd (Respondent's Exhibit "B").

That Mayes told Boyd he was prepared to provide him with a final draft of the second patent application when he was guaranteed by someone that he would be paid.

That notwithstanding the February 22, 1972, deadline by which a response to the Patent Office Action Letter must be filed or the application would be considered abandoned, Mayes testified:

"Q: Now, you were here when Mr. Ryan was testifying as to what was necessary to complete the application or complete the work to secure the patent on this invention of Mr. Boyd's. Now, is his testimony correct that if something was not done on or about February 22 there was a very real possibility that the patent would be abandoned? He would never be able to patent this invention?

A: It is not a possibility. It is a fact. It would be held abandoned unless a complete response was filed by the declared deadline unless, of course, you asked and got an extension.

Q: Well, did you not feel some obligation after undertaking this work to secure the patent?

A: No. My—I'm a contract worker. They pay me to do something, I do it, and that's it.

Q: They had already paid you or you had been paid $2,185.00 from these people?

A: It has been accounted for. It is contract work. I was paid in advance in those cases for the work I did. For the work I did, I got paid in advance. I got paid my fee for preparing and filing the patent application, and that was it. I have no obligation to them other then what I contracted to do. That is the way the patent business is run, and she's a toughy."

(T-429, 430)

### DISCUSSION

Mr. Mayes' conduct as illustrated by the record exhibits an appalling lack of communication with his client, Boyd, and his client, Honn, and an absolute refusal to talk to Boyd after the February, 1972, telephone call. Mayes did not keep the last appointment with Boyd but did not cancel the appointment either leaving Boyd waiting for an hour. Mayes refused to give an accounting of his fees and expenses although by his own testimony he would only have had to copy Respondent's Exhibit "B" and mail it to Boyd. He accuses his clients of being tricky, lying and of not paying him for his work.

While Mayes on the one hand recognizes that once he's taken a deposit he has an obligation to his client to carry the matter through; he then feels no obligation to protect his client, Boyd's valuable property, and prevent its being held abandoned by failure

to file a response to the Patent Office Action Letter (until he is paid $200.00 in advance).

## CONCLUSION

The panel concludes that Mr. Mayes has violated the following disciplinary rules with respect to the Boyd complaint:

DR 1-102 A (5) in that he engaged in conduct that was prejudicial to the administration of justice;

DR 1-102 A (6) in that he engaged in conduct that adversely reflects on his fitness to practice law;

DR 6-101 (A) (3) in that he neglected legal matters entrusted to him;

DR 7-101 A (3) in that he placed his client's property rights in jeopardy during the course of his representation of the client.

## SUMMARY

It is therefore the conclusion of the Panel that Mr. Mayes has violated the following rules of Professional Responsibility:

DR 6-101 A (3); DR 7-101 A (2); DR 7-102 A (5);
DR 9-102 B (4) and DR 2-106 A
in respect to the HONN COMPLAINT;
DR 1-102 A (5); DR 1-102 A (6); DR 6-101 A (3)
DR 7-101 A (3)
with respect to the BOYD COMPLAINT.

It is further the conclusion of the Panel that in his conduct at the time of the hearing and his testimony therein, Mr. Mayes has violated:

DR 6-101 A (2); DR 7-106 C (1); DR 7-106 C (2);
DR 7-106 C (3); DR 7-106 C (4); DR 7-106 C (6);
DR 7-106 C (7); DR 1-102 A (5); DR 1-102 A (6)
and DR 9-102 A (2);

and the Panel specifically finds that the respondent, RONALD WAYNE MAYES, is guilty of disregarding the duties of honesty, fidelity, candor and fairness he owes to his clients, the complainants herein, and that he is an unsafe person to manage the legal affairs of others.

The panel, therefore, recommends that RONALD WAYNE MAYES be disciplined by DISBARMENT.