No. 47,753

STATE OF KANSAS, *Petitioner,* v. RICHARD L. HILTON, *Respondent.*

(538 P. 2d 977)

Opinion filed July 17, 1975.

*Michael C. Cavell,* Assistant Attorney General, argued the cause, and *Curt T. Schneider,* Attorney General, was with him on the brief for the petitioner.

*Edgar Wm. Dwire,* of Malone, Dwire, Glover & Hobbs, of Wichita, argued the cause and was on the brief for the respondent.

*Per Curiam:* This is an original proceeding in discipline. The respondent, Richard L. Hilton, a member of the bar has been practicing in Wichita, Kansas, since 1963. This proceeding is the result of two complaints filed against respondent.

The first complaint was lodged by Tommie Gene Padgett. It was predicated on a conflict of interest charge arising from respondent's continued representation of Padgett in a criminal case after a conflict appeared between the position of Padgett and a codefendant, Gerald Ray. Padgett filed a complaint with the disciplinary administrator charging that respondent continued to represent him, as well as Ray, after it was discovered that the state would deal with Ray, but not with Padgett, on plea negotiations. Padgett also claimed that respondent failed to return to him or his subsequently retained attorney, Russell Shultz, papers which he claims were pertinent to his defense.

The second complaint against respondent stems from a charge made by Mary V. Jenkins concerning a fee arrangement made with respondent in connection with respondent's representation of Claude Jenkins, the complainant's son. Respondent was charged with the wrongful appropriation of $1,000.00 advanced by Mrs. Jenkins, which she claims was to be used for the posting of a bond. Respondent was also accused of entering into an agreement which was alleged to amount to the representation of the defendant in a criminal action for a contingent fee.

A hearing was held on the complaints by a three-member panel of the State Board of Law Examiners (hereafter referred to as the Board). The panel filed its report containing its findings and a recommendation that the respondent should be disciplined by public censure. The Board, after considering the report of the hearing

panel, adopted the same and recommended to this court that the respondent should be disciplined by public censure. The respondent filed his exceptions to the report of the Board and the matter is now before this court for determination.

A voluminous transcript of the proceedings before the hearing panel is in the record before us; however, a brief summarization of the facts developed is sufficient for a determination of the matter.

Turning to the first or Padgett complaint, respondent became involved in the case when he was approached by John Pichinson, a Texas attorney practicing in Corpus Christi, who asked respondent to act as local counsel. Padgett and Ray had been arrested and charged with attempted arson and other offenses. Padgett and Ray were arrested in a building which had been "staked out" by police officers under the direction of the attorney general. At the time of their arrest, on March 15, 1973, Padgett and Ray were in the possession of twenty-five gallons of inflammable materials and a pass key to the building. Identical charges were filed against Padgett and Ray, and apparently they were in identical situations except that Ray had a previous criminal record involving arson in 1971. Padgett and Ray had become acquainted with Pichinson in Texas several months before their arrest in Wichita.

The evidence discloses that respondent accepted employment in the case with the understanding that he would act as local counsel and that Pichinson would be the lead counsel for defendants at trial. A preliminary hearing was held on May 17, 1973. Pichinson and respondent both appeared at the first day of the preliminary hearing. Pichinson left the evening of the first day and respondent appeared alone as counsel for Padgett and Ray on the second day. During the second day of the hearing the charges were dismissed for technical reasons and were refiled. A second preliminary hearing commenced on July 3, 1973. Respondent appeared without Pichinson at this hearing and represented both Padgett and Ray. Padgett and Ray were bound over after the second preliminary hearing and were directed to appear for arraignment before the district court on July 18, 1973.

After the second preliminary hearing Attorney General Miller requested respondent to talk with him and one of his deputies concerning the possibility of working out a plea for Padgett and Ray. There is testimony indicating that the state desired Ray to give testimony involving a Mr. Daugherty whom state officers thought

was the central figure in an arson ring. The evidence discloses that respondent represented both Padgett and Ray and advised them during the discussions involving negotiations. Respondent attempted to get immunity for Ray. The attorney general would not give immunity, but only offered a suspended sentence and probation for Ray. The attorney general refused to deal with Padgett. Respondent testified that at this point in the proceedings he declared there was a conflict of interest and that Padgett should get another attorney. The precise date of respondent's withdrawal, as Padgett's counsel, is not shown. Padgett retained Russell Shultz, another Wichita attorney, to represent him. Respondent testified that he turned over his files to Mr. Shultz and authorized him to pick out anything pertaining to Padgett's case. Padgett, on the other hand, flatly denied respondent's testimony on this point. Padgett testified that respondent did not cooperate with Shultz and further that respondent even claimed that he had no material pertaining to Padgett's case.

Padgett and Ray went to trial in November 1973. At the close of the *voir dire* examination Ray changed his plea to guilty—respondent continued to represent Ray throughout the proceedings. Padgett was represented by Mr. Shultz and was acquitted of all charges filed against him. Correspondence offered in evidence before the hearing panel indicates a dispute between Padgett and respondent concerning an attorney fee, but it has no bearing upon the issue herein.

The thrust of the panel's findings with respect to Padgett's complaint is that respondent, even though he had withdrawn as an attorney for Padgett, continued to represent Ray in a criminal trial at which Padgett was a codefendant; the respondent continued plea negotiations for Ray, but did not communicate this fact to Padgett or his newly appointed attorney, Mr. Shultz; and that respondent during the plea negotiations agreed that Ray would plead guilty and would give state's evidence against the remaining codefendants.

The hearing panel concluded that, from the facts within his knowledge at the time, respondent should have realized that matters to the advantage of one client might become disadvantageous to the other; thus, impairing his independent professional judgment toward the case of one client or the other in violation of No. 5 of the Canons of Professional Ethics adopted by the American Bar Association (198 Kan. XVII, XVIII [now Supreme Court Rule No. 501]), and more specifically Disciplinary Rule DR 5-105 (B) and

(C), of the Code of Professional Responsibility. (214 Kan. lxxxvi.)

The gist of respondent's exceptions to the Board's decision on the Padgett complaint is that the evidence does not justify the finding of a violation of DR 5-105 (B) and (C). Respondent further asserts that the facts show there was no impairment of professional judgment towards either client.

Canon 5 of the Code of Professional Responsibility reads as follows:

"A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client."

Disciplinary Rule DR 5-105 (A), (B) and (C) reads:

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105 (C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105 (C).

"(C) In the situations covered by DR 5-105 (A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

It is respondent's position that he did withdraw as Padgett's counsel, as soon as a conflict between Ray and Padgett became apparent and that, in any event, Padgett's case was not prejudiced since he was acquitted. Respondent further claims that even though Ray testified as a state's witness, his testimony did not harm Padgett, but in fact strengthened his defense of entrapment. Respondent says he never disclosed anything that was harmful to Padgett.

There are many inconsistencies in the testimony of Padgett and respondent before the hearing panel. We are, however, able to ascertain from the record that soon after the second preliminary hearing, at which respondent represented both Ray and Padgett, the attorney general approached respondent concerning immunity or a negotiated plea for Ray. Respondent asked immunity for both defendants, which was declined by the attorney general. However, the attorney general continued to seek an arrangement with Ray in further discussions with respondent. At this point, early in July 1974, respondent knew there was a strong likelihood that Ray would either be granted immunity or enter a plea of guilty after

negotiations with the state. While Padgett, on the other hand, had declared that he would not plead guilty under any circumstances. Respondent continued to represent both parties through arraignment on July 18, 1973.

Within a few weeks after arraignment, Padgett retained Russell Shultz, as his attorney. Respondent continued to participate in plea negotiations for Ray, but did not inform Shultz or Padgett concerning his activities in this regard.

Respondent knew—or should have known—that a serious conflict of interest would arise at the first indication that Ray might become a state's witness as a result of plea negotiations or the granting of immunity. Respondent should have withdrawn immediately as Padgett's counsel; and if he had received privileged communication from Padgett that might have been used to Ray's advantage and to Padgett's disadvantage, he should have withdrawn as counsel for both parties.

In undertaking to represent codefendants in a criminal case counsel should always be aware of conflicts which may and frequently do arise. The most serious conflict that might arise is that which occurred in this case—*i. e.*, one defendant takes a plea and becomes a state's witness while the other goes on to trial on a plea of not guilty to the same charge.

While counsel may, under the circumstances prescribed in DR 5-105 (C), ethically represent multiple defendants in a criminal case, where all defendants stand in the same position and join in the same theory of defense, he must, nevertheless, recognize the appearance of any conflict and act accordingly. The unmistakable intent of DR 5-105 (C) is exemplified in "Ethical Considerations" [EC] 5-15 (ABA Standards, Code of Professional Responsibility). It reads in pertinent part:

"If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. . . ." (p. 60.)

This court noted the potential hazards involved in multiple representation in *Stump v. Flint,* 195 Kan. 2, 402 P. 2d 794, wherein we said:

". . . [W]e think it imperative, if the legal profession is to attain the public respect to which it legitimately aspires, that attorneys act with the greatest circumspection in the representation of multiple clients where there

exists a possibility that their interests may conflict or be at cross purposes." (p. 11.)

In the instant case both Padgett and Ray were caught "red-handed" in possession of arson materials in a building which had been "staked out" under the supervision of the attorney general. Under such circumstances it was apparent on respondent's initial entrance into the case that entrapment was the only available defense. Since Ray had a previous arson record (of which respondent was aware), he was in a different position from that of Padgett with respect to the defense of entrapment. Under such circumstances respondent could not ethically accept dual representation. Actual prejudice to Padgett is immaterial except as to its bearing on the degree of discipline. We believe public censure, as recommended by the Board, to be an appropriate measure of discipline under the circumstances.

The second complaint concerns respondent's representation of Claude Jenkins, eighteen years of age, who was charged with burglary and theft. Claude's mother, Mrs. Mary V. Jenkins, employed respondent to represent Claude and paid him $750.00 on a general retainer of $1,500.00. The balance was to be paid before final disposition of the case.

On the date set for Claude's preliminary hearing, respondent and Claude agreed that the hearing should be waived and a plea of guilty entered. From this point on respondent's principal efforts in Claude's behalf were directed toward securing probation or a suspended sentence for Claude.

Respondent asked Mrs. Jenkins to come to his office to discuss her son's case—at which time, at his request, Mrs. Jenkins paid him the additional $750.00 by check marked "payment in full." In the meantime, Claude's case had been set down for sentencing in district court. Respondent asked Mrs. Jenkins for an additional $1,000.00, which was to be used to offer to the court as a "probation bond." Mrs. Jenkins then gave respondent a check in the amount of $1,000.00, marked "cash bond to court." Respondent testified that he deposited the two checks in the Southwest National Bank where he maintained two accounts; one entitled "personal" and the other "business." He testified that he also had an account entitled "clients account" in the Union National Bank where he deposited some collections to be turned over to clients.

On May 24, 1972, Claude entered pleas of guilty in district court, and sentencing was set for June 22, 1972, when sentence was im-

posed. The judge rejected the $1,000.00 probation bond idea and took Claude's application for probation under advisement. Immediately following the sentencing hearing, respondent had a conference at the counsel table with Claude and Mrs. Jenkins. The testimony concerning the counsel table conference and subsequent events is in conflict. The hearing panel's findings of what took place is summarized as follows:

"At the counsel table respondent said an additional $1,000.00 was needed and suggested that the payment of $1,000.00 'cash bond to court' could be used for that purpose; that complainant and Claude agreed this money could be used as fee if respondent 'got Claude out.' The next day, June 23, 1972, the judge granted probation. The respondent transferred the money to apply on fee in compliance with the agreement. Complainant has no remembrance of the counsel table conference. Claude testified he would agree to anything 'just to get out' and he promised he would pay back his mother. Respondent presented several witnesses to support his testimony as to the counsel table conference agreement. During four or five months following the probation of June 23, complainant made many demands of respondent to refund the $1,000.00 'cash for bond to court' money. She stated that more than once he said he would return it. Respondent denied this. In November, 1972, Claude was picked up for parole violation. He called respondent who agreed to represent him without any more fee. The bondsman's fee for bond on this offense was $250.00 Respondent gave his check for that amount drawn on his Union National Bank account payable to Claude and complainant. Complainant refused to endorse it, saying she was entitled to a refund of the entire $1,000.00. Complainant sued respondent for return of the $1,000.00 alleging it to be unearned fee. The suit was settled without trial."

The panel concluded that respondent's failure to deposit the $1,000.00 "cash bond to court" check in his client's account was a violation of DR 9-102 (A) (214 Kan. xcii), and further that the so-called new fee arrangement for the $1,000.00 to be used as a fee if probation was effected was a contingent fee arrangement in violation of DR 2-106 (C) (214 Kan. lxxxii).

Disciplinary Rule DR 2-106 (C) reads:

"A lawyer shall not enter into an agreement for, charge, or collect a contingent fee for representing a defendant in a criminal case."

Disciplinary Rule DR 9-102 (A) reads:

"(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

"(1) Funds reasonably sufficient to pay bank charges may be deposited therein.

"(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved."

Concerning the violation of DR 9-102 (A), respondent maintains that the $1,000.00 bond check was a "cost or expense" of litigation and was, therefore, within the exception of the rule. We cannot agree. The $1,000.00 was not advanced for costs or expenses of litigation, but for the specific purpose of providing a cash bond to be offered to the court in support of Claude's application for probation. If the proposition was rejected by the court the $1,000.00 was to be returned to Mrs. Jenkins. At the time the $1,000.00 was tendered it was funds belonging to Mrs. Jenkins and remained as such unless accepted as a cash bond by the court. It should have been initially deposited in the client's account under the mandate of DR 9-102 (A). Respondent points out that at all times pertinent his business account never fell below a balance of $4,600.00. His argument at best fails to take into consideration the rule against commingling of funds. (See, *State v. Barrett*, 207 Kan. 178, 483 P. 2d 1106, and ABA Standards, "Ethical Considerations," [EC] 9-5.)

Concerning the contingent fee accusation, respondent says there is no evidence to support the panel's finding that there was an agreement that the $1,000.00 would be used as a fee if respondent "got Claude out." We are inclined to agree with respondent on this point. However, respondent's demand for an additional fee of $1,000.00 at the time and under the circumstances existing cannot be condoned. Respondent made demand for the additional fee at the conclusion of the first day's hearing on probation. The court still had the matter under advisement and the issue whether probation would be granted was not to be decided until the following day. Claude and his mother were faced with going to court the next day without a lawyer and, thus, apparently agreed to the additional fee, although Mrs. Jenkins denied any such agreement. The demand, at this point in the proceedings, for an additional fee that was not contemplated in the retaining agreement violated the spirit, if not the letter of DR 2-106 (C).

Finally, respondent contends public censure is excessive and unjust punishment under the facts presented in this case. While the record fails to show that his clients suffered actual prejudice, nevertheless, respondent's conduct fails to measure up to the standards

of the applicable Disciplinary Rules. In evaluating the conduct of an attorney, it must be kept in mind that the Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action. (*State v. Alvey*, 215 Kan. 460, 524 P. 2d 747.) We take note that respondent was previously before this court on another disciplinary matter. (*In re Hilton*, 213 Kan. 27, 521 P. 2d 600.) Under the circumstances, we believe the Board's recommendation of public censure is appropriate.

It is therefore by the court considered, ordered and adjudged that Richard L. Hilton be and is hereby censured by this court. Costs of this proceeding are taxed to respondent.

FROMME, J., not participating.