No. 54,211

STATE OF KANSAS, *Petitioner*, v. JOHN CALLAHAN, *Respondent.*

(652 P 2d 708)

Opinion filed October 22, 1982. Indefinite suspension.

*Roger N. Walter*, disciplinary counsel, argued the cause and was on the brief for the petitioner.

*Patrick L. Dougherty*, of Wichita, argued the cause, and *Harry W. Saums*, also of Wichita, was with him on the brief for the respondent.

*Per Curiam:* This is an original proceeding in discipline. The proceeding is the result of a complaint filed on behalf of Mrs. Ruth Fulton.

Ruth Fulton, an elderly lady, owned 320 acres of land in Butler County which she had inherited from her father. Although she was born in Kansas, she has been a resident of California for over 60 years, and the land had been leased to a neighboring landowner for a number of years.

In 1974, Mrs. Fulton decided to sell her land. She first offered it to her tenant who declined the offer. He advised, however, that a Lowell Lygrisse was in the market for such property and offered to contact him.

Subsequently, Lygrisse called Mrs. Fulton by phone and a tentative agreement was reached. During this conversation, Lygrisse suggested that the respondent, John Callahan, handle the transaction for both of them. Mrs. Fulton agreed, and later called respondent and retained his services.

The interpretation of the parties as to respondent's scope of employment differed. Mrs. Fulton stated that she believed respondent would act as a California escrow officer would and protect the interests of both parties. Respondent testified that he believed that he represented both parties as a scrivener to draw the papers and close the sale only after the terms of the purchase agreement had been negotiated between the parties.

Respondent prepared two contracts controlling the sale in accordance with the terms provided by Lygrisse and without consulting Mrs. Fulton. The first contract was entitled "Real Estate Purchase Contract." It provided for a sale price of $96,000.00, to be paid $24,000.00 at the time of closing and the

balance in three annual installments of $24,000.00 each. The first annual installment was to be secured by a certificate of deposit.

The contract was unusual, however, in that it provided that the seller would execute and deliver a deed to the buyer at closing, and that the land would be included with other land in a mortgage to the Federal Land Bank. Although Mrs. Fulton did not fully understand the transaction, she signed the contract on November 14, 1974, in reliance upon respondent.

On December 11, 1974, respondent wrote to Mrs. Fulton enclosing a deed for her to sign and informed her that he would hold the deed until the first $24,000.00 was paid. He also informed her that when Lygrisse secured his loan from the Federal Land Bank, respondent would purchase a certificate of deposit in the amount of $24,000.00 and pledge it as security for the second payment, and that he would then formalize the agreement on the balance owing. Mrs. Fulton signed the deed and returned it to respondent.

Thereafter, respondent filed and conducted the necessary legal action to quiet title to the land and obtained inheritance tax clearance. He also advised Mrs. Fulton as to certain tax consequences of the sale. He billed Mrs. Fulton on March 14, 1975, for his services in clearing the title and was paid.

The second contract was entitled "Pledge, Escrow and Agreement." It recited the schedule of payments on the unpaid balance and set up an escrow of the certificate of deposit securing the first annual payment due April 1, 1976.

It differed from the first contract of sale in that Paragraph 7 provided for acceleration of the unpaid balance upon default and provided:

"In the event of default and nonpayment of any judgment therefore the Fulton's shall have a specific lien on the real estate covered hereby subject only to the Federal Land Bank first mortgage of record."

Mrs. Fulton signed the agreement on May 21, 1975, in reliance on respondent's request as her attorney, without independent legal advice, believing that the provisions of paragraph 7 would effectively place her in the position of a second mortgagee. She further assumed respondent would record anything necessary to perfect her "specific lien." No such other documents were prepared or recorded by respondent.

For several years before and after 1974, respondent was Lygrisse's personal attorney, and they were each owners of 50% of

the common stock of L-C Farm Co., Inc., a corporation engaged in buying and selling farms and other real estate. Respondent was required to and did personally guarantee some or all of the debts of the corporation which at times exceeded $500,000.00. The Fulton farm was not purchased for the account of L-C Farms Co., Inc., however, and no claim is made that respondent personally acquired any interest therein. Respondent admits that he did not disclose to Mrs. Fulton his business relationship with Lygrisse.

No problem arose until Lygrisse defaulted on the final payment due April 1, 1978. Mrs. Turner called respondent several times for advice. He told her that Lygrisse had suffered some business reversals but that he was sure Lygrisse would make the final payment. Sometime in late 1978, she contacted respondent again and asked how long she had to file for foreclosure. Respondent advised her that she had five years from the date of default, but suggested again that she didn't need to foreclose, that he was sure Lygrisse would pay.

In May of 1979, Mrs. Fulton and her husband traveled to Wichita and met with respondent for the first time in person. They asked respondent to file a foreclosure action on what they perceived to be their second mortgage. Respondent declined, citing as his reason a conflict of interest, but he agreed to refer them to another attorney. He did not advise them at that time that they did not have a secured interest in the real estate.

The Fultons then went to see Lygrisse who promised to pay them within a few weeks. When the payment was not forthcoming, Mrs. Fulton again phoned respondent who again assured them that he believed Lygrisse would pay and advised them not to foreclose.

Finally, on March 1, 1980, Mr. Fulton called respondent and again asked for the name of an attorney to file foreclosure proceedings. During this conversation, respondent for the first time advised the Fultons that they had no mortgage and that all they had was a promissory note.

The Fultons were subsequently referred to Jim Lawing of Wichita, who prepared and filed a malpractice action against respondent. Shortly thereafter respondent filed a voluntary petition in bankruptcy and was ultimately discharged.

In the spring of 1980, the Federal Land Bank foreclosed its mortgage against the Fulton farm. Mrs. Fulton was not a party to

the action and learned of the action through independent inquiry. Included in the action was a second mortgage given to an El Dorado bank by Lygrisse around the time the down payment to Mrs. Fulton was made. She has never received the final payment of $24,000.00.

Following a letter of complaint from Jim Lawing to the disciplinary administrator, a formal complaint with Lawing's letter attached was filed by the disciplinary administrator before the Board for Discipline of Attorneys. A hearing was held on November 18, 1981, and the hearing panel found that respondent had violated disciplinary rules DR 5-105 (B), DR 6-101 (A) (3), and DR 1-102 (A) (4). It recommended indefinite suspension of respondent. Respondent has taken exception to the report.

The hearing panel found that respondent had violated DR 5-105 (B) in that he represented both the sellers and the buyer when a conflict of interest existed by failing to warn the sellers that they did not have a perfected second mortgage or security interest.

Disciplinary rule DR 5-105 (B) and (C) (228 Kan. cxiii) reads as follows:

"*Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.*

. . . .

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105 (C).

"(C) In the situations covered by DR 5-105 (A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after a full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

It is respondent's contention that the terms of the sale were agreed upon between the parties before he was employed and that he only represented the parties, insofar as the contract of sale was concerned, as a scrivener to write up the contract and close the sale in accordance with the prior agreement of the parties. He asserts further that he was under no duty to suggest "better terms" for the seller or to make and record a second mortgage not called for by the terms of the contract.

Under the circumstances here, however, we fail to see how respondent could have been unaware that he was not exercising

his independent professional judgment in behalf of the Fultons in preparing the contract solely on the terms dictated by Lygrisse without consulting the Fultons, or at least advising them of the risk inherent in not taking a second mortgage to secure the balance of the purchase price.

Furthermore, respondent did not make a full disclosure to the Fultons of his close business and professional associations with the buyer.

This court, in *State v. Hilton,* 217 Kan. 694, 698, 538 P.2d 977 (1975), stated:

"The unmistakable intent of DR 5-105 (C) is exemplified in 'Ethical Considerations' [EC] 5-15 (ABA Standards, Code of Professional Responsibility). It reads in pertinent part:

" 'If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. . . .' "

The panel also found respondent guilty of violating DR 1-102 (A) (4) in that he misrepresented to the sellers that they had a specific lien on the property sold, subject only to a first mortgage to the Federal Land Bank, when in fact they had no such lien.

DR 1-102 (A) (4) (228 Kan. cii) provides:

*"Misconduct.*

"(A) A lawyer shall not:

. . . . .

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

Respondent contends that nothing in the pledge agreement provides for a second mortgage. Paragraph 7, he argues, refers only to a lien given to a judgment under K.S.A. 60-2202 (Corrick), and when considered with other provisions of the contract amounts to no more than a warranty that Lygrisse would not allow a subsequent lien or mortgage to attach.

Again, under the circumstances here, we fail to see how the Fultons could reasonably have given such an interpretation to this provision. They believed that they had a "specific lien," and on several occasions when the Fultons inquired of respondent about foreclosure proceedings, he failed to disclose to them that there was no valid foreclosable interest and advised them not to foreclose. He finally offered to give them the name of another

attorney to handle such an action. They were not advised that they had no security interest to foreclose until almost two years after the final payment was due.

The duty of good faith imposed upon an attorney does not always cease immediately upon termination of his employment. It continues as long as the influence created by the relationship continues. *Alexander v. Russo,* 1 Kan. App. 2d 546, 571 P.2d 350, *rev. denied* 222 Kan. 749 (1977). The Fultons still looked to respondent for aid, and his conduct in failing to disclose to them that they had no lien on the property to secure the balance due them clearly rises to the level of deceit and dishonesty.

Respondent claims that he was not afforded sufficient notice of the charges involving paragraph 7. The facts underlying the charge were laid out in the complaint along with Mr. Lawing's letter. Where the facts in connection with a charge are set out in the complaint, respondent is put on notice of what ethical violations may arise therefrom. It is not necessary that the complaint refer to a specific canon that has been violated. *State v. Turner,* 217 Kan. 574, 538 P.2d 966 (1975).

Finally, the report of the hearing panel charged that respondent violated DR 6-101 (A) (3) (228 Kan. cxiv) in that he neglected a legal matter entrusted to him by failing to prepare a second mortgage for the sellers or to file the parties' escrow agreement of record.

This rule provides as follows:

"*Failing to Act Competently.*
"(A) A lawyer shall not:
. . . .
"(3) Neglect a legal matter entrusted to him."

This rule does not as accurately describe respondent's conduct as do the other two disciplinary rules discussed above. Whether or not he was neglectful depends upon whether respondent's duty was as a scrivener only in preparing the contracts or whether he owed a broader duty to exercise his independent professional judgment in behalf of the Fultons after a full disclosure of his close association with the buyer.

We have reviewed the record and we find that the findings of the hearing panel of respondent's misconduct are supported by substantial, clear and convincing evidence.

The possibility that the Fultons might recover the last payment

due from the buyer by filing suit against him, as suggested by respondent, should not forestall the imposition of a penalty for violations of disciplinary rules. Disciplinary proceedings are for the protection and benefit of the public at large. *State v. Scott,* 230 Kan. 564, 639 P.2d 1131 (1982). Professional misconduct is not excused because ultimately no loss is suffered. *Athearn v. State Bar,* 20 Cal. 3d 232, 142 Cal. Rptr. 171, 571 P.2d 628 (1977); *In re Albright,* 274 Or. 815, 549 P.2d 527 (1976).

Respondent complains that the penalty recommended is too severe. This court in *State v. Scott,* 230 Kan. 564, reviewed some of the cases from this State involving ethical violations and the penalties involved. The degree of punishment should be commensurate to the violations involved. The Fultons relied upon respondent to represent them as their lawyer rather than as a mere scrivener. He failed to disclose his close business ties with Lygrisse and to exercise his independent professional judgment in behalf of the Fultons in preparing the contracts for the sale. His delay in apprising the Fultons that they had no foreclosable interest was less than an honest representation. Under the circumstances, we believe the Board's recommendation for indefinite suspension is appropriate.

It is therefore by the court considered, ordered and adjudged that the respondent be suspended from the practice of the law for an indefinite period. The costs of this action are assessed to respondent.

FROMME and HOLMES, JJ., not participating.