No. 60,383

In the Matter of JOHN E. WILKINSON, *Respondent.*

(744 P.2d 1214)

Opinion filed October 30, 1987.

*Barton Brown,* of Wallace, Saunders, Austin, Brown and Enochs, Chartered, of Overland Park, argued the cause and was on the brief for respondent.

*Bruce E. Miller,* disciplinary administrator, argued the cause and was on the brief for petitioner.

*Per Curiam:* The Kansas Board for Discipline of Attorneys filed a report on a complaint against John E. Wilkinson, attorney respondent, on January 12, 1987. Respondent was found to have committed six violations of Supreme Court Rule 225. 235 Kan. cxxxvii. The Board recommended discipline in the form of suspension as prescribed by Supreme Court Rule 203(a)(2). 235 Kan. cxxiv. Respondent filed exceptions to the Board's report and the matter is before this court for review.

The facts from which these disciplinary complaints arose are as follows. Respondent John E. Wilkinson is a Kansas lawyer admitted to practice in the state in 1958. Dr. Glenn Bair, a Topeka physician, was a client of Wilkinson's from 1977 until June of 1983. Dr. Bair referred a patient, Dennis Williamson, to Wilkinson for legal services; then Williamson referred a friend of his, Gerald Monhollen, to Wilkinson for legal advice. Respondent's handling of the legal matters of these three clients is the basis of the six ethical violations found by the Board.

Dennis Williamson, a high school dropout, lost his right leg and two fingers on a construction job in August 1979. In 1980, he went to Dr. Bair to obtain medication for his pain, and Dr. Bair recommended he see John Wilkinson about filing suit for his injuries. Williamson did so, and a settlement for a total of $715,000 was obtained in August of 1981. Williamson received $502,000 after legal fees. That same day, Williamson loaned Respondent $100,000.

Respondent was president and sole stockholder in B-K of Kansas, Inc., which owned and operated three Burger Kings in Topeka. Respondent had explained to Williamson he would lose his three Burger King franchises if he could not come up with the money to install drive-through facilities. On the other hand, he

told Williamson, he believed the existence of such facilities would increase business by 40-50%. He accepted Williamson's loan of $100,000 at 5% interest, explaining he would then be able to help Williamson with future legal advice at no charge. He issued a promissory note from B-K, Inc., to Williamson. The note was unsecured and Respondent did not personally guarantee the loan.

At the time, a commercial loan of $100,000 to Respondent would have required security and the interest rate would have been around 18%. Respondent was unable to obtain a commercial loan.

During the corporation's fiscal year ending August 31, 1981, B-K, Inc., showed a loss of $339,113 and had a cumulative stockholder's deficit of $593,805. Respondent had earlier contemplated bankruptcy.

Except for a payment of $1,700 in October of 1982, Respondent made no payments of interest or principal to Williamson during 1981 or 1982.

In January of 1983, B-K, Inc., through Respondent as president, executed to Williamson another unsecured promissory note, to replace the previous note, in the amount of $100,000 at 12% interest per annum payable monthly. Some payments were made, but B-K ultimately defaulted and filed bankruptcy. Williamson was ultimately paid the amount of the note from Respondent's malpractice insurance carrier.

Respondent argues there is no evidence he *intentionally* did anything to damage Williamson. He contends the Board should have made findings of fact on certain testimony which supports his assertion of lack of intention to damage Williamson:

1. Respondent believed, at the time of the loan, that he would be able to pay back the loan. He did not know Burger King had decided to recapture his franchises.
2. Williamson was fully aware of the problems Respondent was having with the franchise before he consented to give the loan.
3. Respondent replaced the 5% note with a note paying 12% in January of 1983 (Respondent does not mention the replacement was at Williamson's request because he was not receiving regular repayment).

Respondent did in fact do some other legal work for Williamson without billing him. However, he subtracted interest payments for this work in an amount possibly greater than he would have regularly charged.

Respondent also urges this court to consider that Williamson has been made whole by Respondent's malpractice carrier. A client's ultimate reimbursement for attorney wrongdoing does not excuse professional misconduct. See *State v. Callahan*, 232 Kan. 136, 652 P.2d 708 (1982). The respondent in *Callahan* argued he should not be disciplined for violation of disciplinary rules because there was a possibility his client could recover payments due him by filing suit. This court held eventual recovery is not a defense to a professional violation. 232 Kan. at 141-42.

The first issue is whether clear and convincing evidence supports the factual findings of the Board which underlie its conclusion Respondent violated DR 7-101(A)(3) (235 Kan. cxlvii) by negotiating a loan on unconscionable terms out of Williamson's settlement without Williamson having received independent legal advice.

DR 7-101(A)(3) forbids a lawyer from intentionally prejudicing or damaging his client during the course of their professional relationship.

Respondent intentionally let Williamson risk losing a substantial amount of money. He also intentionally caused Williamson to lose a substantial amount of interest on that money. We hold there is clear and convincing evidence Respondent intentionally damaged his client in violation of DR 7-101(A)(3).

The second issue stems from the same facts and is whether clear and convincing evidence supports the factual findings of the hearing panel that Respondent violated DR 1-102(A)(4) (235 Kan. cxxxvii) by misrepresenting to Williamson he was personally responsible for payment of the $100,000 debt.

DR 1-102(A)(4) prohibits conduct "involving dishonesty, fraud, deceit, or misrepresentation." Williamson testified he understood Respondent was personally obligated to pay off the loan. The Board found Williamson to have "a strong interest in supporting some of the contentions made by the Disciplinary

Administrator" because of the then pending malpractice suit against Respondent.

Respondent argues Williamson's testimony is not sufficient to meet the clear and convincing standard required for the imposition of discipline. He argues the Board found only that Williamson did not *know* Respondent was not personally responsible for the loan. Respondent contends this finding of fact will not support a conclusion that he *represented* to Williamson he was personally liable.

Even were we to find the evidence not clear and convincing Respondent represented he was personally responsible on the note, the Disciplinary Administrator contends the Code was still violated. Respondent maintains he intended to be responsible for the note, but the evidence shows he made certain he was not in fact personally responsible for it. The Board found this action, when Respondent knew B-K, Inc. was near bankruptcy, to be a violation of professional ethics. The Administrator also claims Respondent violated his oath not to deny the rights of any person for lucre. Supreme Court Rule 702(i), 235 Kan. clxxxiii.

Whether or not Respondent specifically promised Williamson he was personally responsible for the debt, his statements throughout the transaction justified Williamson's belief Respondent would hold himself personally responsible. The contrast between Respondent's words and his actions in making certain he was not in fact personally responsible shows an intent to misrepresent the facts to Williamson. We hold Respondent violated DR 1-102(A)(4).

The next issue involves a loan of $500 from Williamson to his friend, Gerald Monhollon. When Monhollon was later injured in an accident, Williamson referred him to Respondent. It was agreed Respondent would pay Williamson the $500 owed him from the proceeds of the lawsuit he filed on Monhollon's behalf. In November of 1983, Respondent took the $500 for Williamson out of the settlement along with his fees and expenses. He did not remit the funds to Williamson. He did not put the funds in a segregated trust account. He put the funds in his general trust account. He closed this account before filing bankruptcy proceedings and used the money to pay his own bills.

The question is whether clear and convincing evidence supports the factual findings of the Board that Respondent violated

DR 9-102 by withdrawing and utilizing for personal expenditures $500 which belonged to Williamson and was originally deposited by Respondent in his law office trust account.

DR 9-102(A) requires a lawyer to put funds of a client in a separately identifiable account. DR 9-102(B) requires a lawyer to promptly notify the client of his receipt of the funds, to maintain complete records and accounting of the funds, and to promptly deliver the funds when requested. 235 Kan. clii.

Respondent argues DR 9-102 does not apply because when he obtained the funds Williamson was no longer his client, and the rule only refers to a *client's* funds. He says his last representation of Williamson was four months earlier. He also objects to the Board's contention that Williamson should be considered a long-term client because of his agreement to provide free services for a 5% loan. He asserts the replacement note at 12% interest he later gave Williamson negated the obligation to provide services.

Respondent agrees the funds should have been sent directly to Williamson but says he did not do so because Williamson was then in Costa Rica. (He was able, however, to send payments on his loan to Williamson in Costa Rica.) Later, he said, he forgot the funds were in his account when he closed it shortly before filing for bankruptcy.

He urges this court to consider he offered to pay the money with interest as soon as it was brought to his attention. This offer was made at his deposition after the complaint was filed. He urges this court to consider the money was paid through Williamson's settlement with Respondent's malpractice insurer.

The evidence is clear and convincing that Williamson was still Respondent's client on the matter of paying the $500, if nothing else. However, it makes no difference because, even if we hold Williamson not to have been a client, *State v. Freeman,* 229 Kan. 639, 629 P.2d 716 (1981), stands for the principle that a lawyer must adhere to the Code of Professional Responsibility in all his actions, whether or not the person affected is defined as a client. In *Freeman,* a lawyer who was acting as a trustee placed loan money meant for the beneficiary of the trust into his own account and used it for his own purposes. He argued he was not subject to discipline under the Code because he was acting as a trustee

rather than a lawyer. 229 Kan. 640-41. We held lawyers are subject to discipline for actions outside strict attorney-client relationships and found a violation of DR 9-102. 229 Kan. at 643.

Respondent argues that in *Freeman* we did not give great consideration to whether there was actually a violation of DR 9-102 because of the overwhelming evidence Freeman had violated DR 1-102. The case does not support this argument. In considering the discipline to be imposed on Freeman, we emphasized we found the commingling of funds reprehensible. 229 Kan. at 644.

DR 9-102 is one of the most clear cut and easily followed rules in the disciplinary code. Funds which belong to a client are always subject to this rule, whether or not the attorney continues to represent that client. We hold there is clear and convincing evidence Respondent violated DR 9-102.

The next complaint involves transactions with Dr. Bair. Shortly after Williamson received the settlement for his injuries, he made four loans in a six-month period (October 1, 1981 - March 8, 1982) to Dr. Bair totalling $245,000. The loans were secured by mortgages on The Manor, a nursing home Bair owned. The Disciplinary Administrator contends Williamson discussed each loan with Respondent, who did not discourage him although he knew prior outstanding liens exceeded The Manor's value. The Board did not find this to be supported by clear and convincing evidence, however; thus this facet of The Manor transaction is not at issue here. Dr. Bair engaged Respondent's services in February 1981 to sell The Manor. Respondent and attorney Gene Hackler were to receive 10% of the gross sale price. This gave rise to the next issue.

Respondent prepared the Williamson/Bair promissory notes and mortgages and undertook responsibility for recording the mortgages with the register of deeds at the same time he was representing Bair in the sale of The Manor.

Bair failed to keep current on the monthly interest payments as required by the promissory notes. Williamson executed releases on his mortgages on The Manor in August 1982 and Bair in return executed a replacement consolidated mortgage in the amount of $245,000 at 24% interest per annum payable monthly. The releases and mortgages were prepared by Bair according to

forms provided by Respondent. (The original mortgages, typed in Respondent's office, had releases typed in their margins.) The replacement mortgage was never recorded.

Respondent recorded the releases of the old mortgages in November during negotiations for the sale of The Manor, but did not record, or urge Williamson to record, the replacement consolidated mortgage in the amount of $245,000. Lawyer's Title required the releases of the original mortgages be filed before it would insure title. Office notes kept by Respondent's employee disclose payment to Williamson out of proceeds from the sale of The Manor was not contemplated by Respondent. The proposed closing statement prepared by Respondent's employee shows distributions to Bair of $128,513.79 and $46,100.00 to Respondent, but no mention of Williamson.

When the sale fell through, negotiations began with another group. Respondent's office prepared another closing statement. It showed a $52,000 distribution to Respondent but, again, no mention of Williamson.

The sale of The Manor was finally consummated with the second group. The closing, scheduled for May, had to be extended. In June, Bair presented Respondent with a bill for $48,500 for medical consultation about patients he had referred to Respondent for personal injury claims. Respondent submitted in return a bill for $91,600 for legal services in trying to sell The Manor and then notified Bair he was withdrawing as his attorney after he collected the fee.

At about this time in June, Respondent told Williamson it was unlikely either of them would get their money from Bair. He told Williamson he was at the bottom of the list of creditors because of the releases. Respondent threatened Bair with litigation on behalf of both himself and Williamson. He accused Bair of obtaining loans from Williamson by fraud.

Respondent continued to represent both himself and Williamson throughout June and most of July in attempting to retrieve money from the proposed sale of The Manor. He did not, however, record or advise Williamson to record his mortgage.

Respondent claims he stopped representing Williamson in July of 1983 after telling him he needed to obtain another lawyer.

Williamson denies this. The Board found Respondent continued as Williamson's attorney from August 1981 to January 1985.

The sale of the nursing home was completed in August of 1983. Of the $1,040,000 in sale proceeds, Respondent received $30,000 and Williamson $15,000. Bair also gave Williamson an unsecured promissory note for the $284,391 principal and interest owed, but he defaulted and the note was discharged in bankruptcy as an unsecured claim.

The Disciplinary Administrator claims the evidence shows Respondent *intentionally* did not record the mortgage so he could obtain $30,000 from the sale; or at the very least, it shows Respondent neglected his duty as an attorney to advise his client of the consequences of failure to record.

Respondent claims he had no duty to record the mortgage and was never asked to do so. He says his last representation of Williamson occurred a month before the sale. At that time, he says it was a "judgment call" whether the mortgage should be recorded because it was a "club" which could be held over Dr. Bair's head. He says Williamson was "far down the list as a mortgage holder" and so it was not certain he would have obtained more money by recording. At the hearing, however, he admitted it would have been in Williamson's best interests to record, and said he told Williamson this. When asked whether it would have been contrary to *his* interests to have the mortgage recorded, Respondent simply replied, "We were in conflict."

Respondent points out Williamson asserted no claim against Bair in Bair's bankruptcy proceeding because he was advised not to by his counsel in the malpractice action against Respondent. Williamson did not follow the advice Respondent claims he gave to obtain the services of another attorney to negotiate with Dr. Bair after July of 1983. Instead, he negotiated on his own with Dr. Bair, receiving stock in exchange for renegotiation of the loan. Respondent again urges this court to consider Williamson's loss was covered by Respondent's malpractice insurance carrier.

The issue here is whether clear and convincing evidence supports the factual findings of the board that Respondent neglected *a legal matter entrusted to him in violation of DR 6-101(A)(3)* by his failure to record or advise Williamson to record the $245,000 mortgage from Bair to Williamson. 235 Kan. cxlvii.

This issue is analogous to one raised in *Callahan,* in which a lawyer represented both the buyer and seller of land. The buyer was a long-term client of the lawyer, as Dr. Bair was to Respondent. The lawyer did not record a mortgage for the seller, and said he was under no duty to do so. This court held, in finding a violation of DR 6-101(A)(3), the duty of good faith does not terminate immediately after employment by the client ends. The duty extends as long as the influence created by the relationship endures. 232 Kan. at 141.

Respondent counseled Williamson throughout the period of Williamson's loans to Bair. Respondent cannot evade the trust reposed in him by Williamson simply by refusing to continue to represent his interests a month before money was actually realized.

We hold Respondent violated DR 6-101(A)(3).

The next issue is whether clear and convincing evidence supports the factual findings of the Board that Respondent violated DR 5-101(A) by representing Williamson to obtain for him proceeds from the sale of The Manor when Respondent was also attempting to recover monies from the sale which he knew would not net enough to pay all creditors.

DR 5-101(A) reads:

*"Refusing Employment When the Interest of the Lawyer May Impair His Independent Professional Judgment.*
(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." 235 Kan. cxlv.

The Board found Respondent violated DR 5-101(A) by representing Williamson's interest in recovering money from the sale of The Manor while at the same time attempting to recover attorney fees from the sale. Respondent knew there would not be enough money to go around. At the hearing, when asked, "As of June and July of 1983 you and Dennis were competing for a scarce amount of dollars, were you not?", Respondent Wilkinson replied, "We were certainly in conflict."

Respondent argues he did not violate the rule because he had the consent of Williamson after full disclosure that he was

attempting to recover attorney fees and there was not enough money to pay everyone in full.

The ABA/BNA has addressed this question of client consent. It points out some courts have held representation must end if a client will be adversely affected by the lawyer's personal interests, even if the lawyer has obtained the client's consent. Kansas is cited as holding this view. ABA/BNA Lawyers Manual on Professional Conduct, p. 51:405.

In the Kansas case cited, however, *Alexander v. Russo*, 1 Kan. App. 2d 546, 553-54, 571 P.2d 350 (1977), the court actually found the attorney did not give full disclosure. This court has held, contrary to the Disciplinary Administrator's assertion, that Kansas law does sometimes allow a lawyer to represent a client with conflicting interests if the safeguards of full disclosure and consent are met. *In re Estate of Seeger*, 208 Kan. 151, 156, 490 P.2d 407 (1971). *Seeger*, however, involved only *potentially* conflicting interests, rather than the clear-cut case of antagonistic interests presently before this court.

This court found a violation of DR 5-101(A) in *In re Lake*, 241 Kan. 351, 737 P.2d 40 (1987). The case was similar to this in that a lawyer encouraged a client to invest a tax refund he had obtained for her in a business operating in a building he owned. He drafted a contract and a promissory note between his client and his tenant while serving as his client's business advisor.

Clearly Respondent had a conflict of interest with his client and, even though he disclosed it, the client did not have outside counsel and advice when he agreed to permit it. Thus, his consent is uninformed. We hold such uninformed consent is not sufficient to exempt Respondent from the obligations of DR 5-101(A).

The final issue is whether clear and convincing evidence supports the factual findings of the Board that Respondent violated DR 5-105(A), (B), (C), and (E) (235 Kan. cxlvi) because he represented his own interests to receive a share of the proceeds from the sale of The Manor paramount to the interests of Bair and Williamson; and because the interests of Bair were in conflict with Williamson's interests and Bair was paying Respondent for legal services out of the proceeds of the sale of The Manor.

DR 5-105 reads in part as follows:

*"Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.*

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).

"(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

. . . .

"(E) A lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by the financial or other interests of the organization which recommends, furnishes, renders or pays for his legal services." 235 Kan. cxlvi.

The interests of Respondent, Williamson, and Bair were in conflict over who was to get The Manor sale proceeds. Respondent represented Bair in trying to sell The Manor; he represented Williamson in trying to obtain payment of the loans to Bair from the sale; and he represented himself in trying to obtain his attorney fees from the sale.

Respondent again argues client consent. He also contends he ceased his representation of Bair in June and his representation of Williamson in July when he realized the conflicts were too great. Respondent also again urges this court to consider that Williamson was made whole by Respondent's malpractice insurance carrier. These arguments are without merit.

There is evidence Respondent planned to cut Williamson out of the proceeds. He failed to file Williamson's mortgage against The Manor. Meanwhile, he raised his attorney fees regarding the sale from $52,000 to $91,600, thus reducing the amount available in any case to Williamson. Respondent claims most of the evidence showing no payment to Williamson was contemplated from sale of The Manor was prepared by his employee, with no knowledge on his part. Yet he also contended, in support of his bill to Bair, that he spent 100 hours reviewing the work done by his employee.

The law is clear that a lawyer cannot use his representation of a

client to his personal financial advantage. *Yeamans v. James*, 27 Kan. 195 (1882). We hold Respondent violated DR 5-105(A), (B), (C), and (E).

We have examined the record and find substantial competent evidence to support the findings of fact of the Disciplinary Board. The facts support the Board's conclusions of law that Respondent violated the following sections of Supreme Court Rule 225, Code of Professional Responsibility (235 Kan. cxxxvii *et seq.*): DR 7-101(A)(3); DR 1-102(A)(4); DR 9-102; DR 6-101(A)(3); DR 5-101(A); and DR 5-105(A), (B), (C), and (E).

We conclude the Board's recommendation that Respondent be indefinitely suspended from the practice of law is appropriate.

IT IS THEREFORE ORDERED that John E. Wilkinson be and he is hereby indefinitely suspended from the practice of law in the State of Kansas.

IT IS FURTHER ORDERED that John E. Wilkinson shall forthwith comply with Supreme Court Rule 218 (235 Kan. cxxxii).

IT IS FURTHER ORDERED that this order shall be published in the official Kansas Reports and that the costs of this action be assessed to the Respondent.

Effective this 30th day of October, 1987.

PRAGER, C.J., not participating.